*ALBANY,*
*Dec. 1831.*

Cram
v.
Hendricks.

---

## Cram *vs.* Hendricks.

The *transfer* by the *payee* of a valid available note, upon which, when due, he might have maintained an action against the *maker*, and which he parts with at a *discount* beyond the legal rate of interest, is not an *usurious transaction*, although the payee on such transfer *endorses* the note; and on non-payment by the maker, the *endorsee* may maintain an action against the *endorser*.

The sum which the *endorsee* in such case is entitled to recover of the *endorser*, is the *amount of the advance* made by him, together with the interest thereof; such, under the settled law of the land, being the extent of the obligation of the endorser in cases of this kind; in an action against the *maker* the endorser is entitled to the whole amount of the note.

*It seems*, however, that such transfer is inquirable into, that is, whether it be a *bona fide* sale of the note, or merely a device to evade the statute of usury, and the question may be submitted to a jury, where there are circumstances independent of the mere transfer to excite suspicion of an intent to evade the statute.

N. B. In support of the principal propositions above expressed, opinions were delivered by *Senators* ALLEN, BEARDSLEY and MAYNARD. *Contra*, The CHANCELLOR and *Senator* SHERMAN.

ERROR from the supreme court. Hendricks, as *endorsee*, sued Cram, as the *endorser* of two promissory notes, made by

one Gomez. The notes amounted, together, to upwards of $3000 ; were given in September, 1825, payable four months after date. The consideration of the notes was *rum* sold by Cram to Gomez. About 3 months before the notes came to maturity, Cram, the payee, employed a broker to *raise money* for him upon the notes, and delivered them to him, endorsed in blank. The broker applied to Hendricks, the father-in-law of the maker, to *discount* the notes, who cashed them, charging a discount of *one per cent. per month* for the time they had to run ; the discount on the two notes amounting to $90,22. Hendricks was informed at the time that the notes belonged to Cram, and that they were to be discounted for his benefit. The notes, when due, not being paid by Gomez, were protested, and notice of non-payment given to Cram, who was sued as the *endorser* of the notes. The jury who tried the cause, were instructed by the circuit judge that the plaintiff was entitled to a verdict for *the amount actually advanced* by him, which lawful interest thereon from the time of the advance. The jury found accordingly. The defendant excepted to the direction given by the judge, and applied to the supreme court for a new trial ; the application was denied, and judgment was rendered for the plaintiff. Whereupon the defendant sued out a writ of error.

The following is the opinion which was delivered in the supreme court :

*By the Court,* SUTHERLAND, J. It is admitted that the notes in question were given by Gomez to Cram for a quantity of rum sold by Cram to him, and that in the hands of Cram, the payee, (before they were discounted by the plaintiff,) they were perfect and available notes, upon which he might have maintained an action against Gomez, the maker. The question then is, whether the discounting of these notes by the plaintiff, thus available in the hands of the payee, at a higher premium than the legal rate of interest, was an usurious transaction, which avoided the notes, or whether it was the mere purchase of valid pre-existing securities. The cases of *Braman* v. *Hess* 13 Johns. R. 52, and *Munn* v. *The Commission*

*Company*, 15 Johns. R. 44, are entirely decisive upon this question.

In the first case the action was brought upon a note drawn by one Williams, in favor of Hess, the defendant, and by him endorsed to Braman, the plaintiff. The defendant offered to shew upon the trial, *in mitigation of damages*, that the transfer of the note by the endorser to the endorsee, was made on a discount of $90. This evidence was rejected at *nisi prius*. But upon a motion for a new trial, it was held that it was competent in an action by the payee against the drawer, and by the endorsee against *his immediate endorser*, to shew what was the real consideration passing between them, and that the plaintiff could recover no more than he had actually paid for the note. The court say, that if this suit was by the endorsee, against the maker of the note, it would not be in his mouth to say the plaintiff purchased it at a discount. But the defendant being the immediate endorser of the plaintiff, the proof offered that the note was purchased for $90 under the face of it should have been admitted. It was not even suggested in that case that the transaction was liable to the imputation of usury, and the observation of the court, that if the suit had been against the maker, he could not have availed himself of the fact that the note had been purchased at a discount, shews conclusively, that in their opinion, there could be no usury in the purchase of a pre-existing valid security.

But in the subsequent case of *Munn* v. *The Commission Company*, 15 Johns R. 44, this precise question arose, was very fully discussed by able counsel, and was deliberately considered and decided by the court. That was an action of assumpsit, brought by the plaintiff, as endorsee, against the defendants, as acceptors of a bill of exchange : it was endorsed to the plaintiff by Oliver Ruggles, the payee of the bill, at a discount greater than the legal rate of interest, and it was contended that this was an usurious transaction, and avoided the bill. The only doubt which the court entertained upon this point, was whether the bill was available in the hands of Oliver Ruggles, the payee, and whether he could have maintained a suit upon it. Judge Spencer, in delivering the opinion of the court, says, upon a more careful examination of the case

we see no reason to doubt that the bill, whilst in the hands of Oliver Ruggles, and before it was discounted by the plaintiff at a higher rate than the legal interest, was a perfect and available bill, and that when it became due he could have maintained an action upon it, either against the defendant, or Herman Ruggles, the drawer. This, he continues, appears to the court to be the true test in distinguishing between a case where the discount of a bill at a higher premium than the legal rate of interest will render the transaction legal by considering it the purchase of a bill already perfect and available to the party holding it, and where it will be illegal as an usurious loan of money.

The principle is too well settled to be questioned, that a bill free from usury in its concoction may be sold at a discount; because, as it was free from usury between the original parties to it, no subsequent transaction with another person can, as it respects those parties, invalidate it. Had it appeared that Oliver Ruggles had no interest in the bill, but had merely lent his name for the accommodation of Herman Ruggles, the plaintiff's purchase of the bill would have been usurious, and he could not have recovered upon it, because until such purchase the bill would have been mere waste paper, and it would have had no existence, or been available, until the plaintiff acquired the title, and that title, being contaminated, and infecting the bill, would be invalid as against all the parties to it. This doctrine is fully sustained by the English authorities, *Wiffin* v. *Roberts*, 1 Esp. R. 261 ; *Daniel* v. *Cartony*, 1 id. 274; *Parr* v. *Eliason*, 1 East, 92 ; *Lowe* v. *Waller*, Douglas, 736; *Ferral* v. *Shean*, 1 Saund. 295, note 1, where the principle is considered, and the cases are collected. See also Ord on Usury, 103, a. 8 T. R. 391. 3 Esp. R. 22. 1 Holt, 256. *Jones* v. *Davison*, note, § 4 and 6.

The doctrine contended for by the counsel for the defendant that wherever the party assigning the note remains liable it is *not a sale of* the *security* but a *loan*, is fully disposed of by the cases in this court to which I have adverted. In *Braman* v. *Hess*, 13 Johns. R. the suit was by the endorsee against the endorser, who transferred the note. In *Munn* v. *The Commission Company*, 15 Johns. R. Oliver Ruggles endorsed the bill

when he sold or transferred it to the plaintiff, and stood in the same relation to him as Hess did to Braman, in the previous case, and was unquestionably equally responsible as endorser.

The case of *Lowes* v. *Mazzaredo*, 1 Starkie's R. 385, also cited in Chitty on Bills, 105, Phil. ed. of 1821, is the only one to be found in which a different doctrine has been held. It was in that case decided that if the payee of a bill of exchange endorses it upon a usurious contract, a bona fide holder cannot afterwards recover upon it against the acceptor. My researches have not enabled me to discover that that case has ever been recognized or followed in England. But whatever may be its authority in Westminster Hall, it cannot authorize a departure in this court from what has been *declared in repeated* adjudications to be the established law on this subject.

Motion for new trial denied.

The writ of error was argued in this court in the summer of 1830 by C. Baldwin for the plaintiff in error, and by B. Haight for the defendant in error. In December of that year, the cause was called up for decision, and on the members of the court expressing their opinions, the vote stood for reversal *nine*, and for affirmance *eight*. There not being a concurrence of opinion of *ten* members, (the number necessary to a decision of a case in this court,) a re-argument was ordered. In the summer of 1831, the cause was again argued by C. Baldwin and B. F. Butler, for the plaintiff in error, and by B. Haight and A. Van Vechten, for the defendant in error. An analysis of the arguments of counsel is not attempted, as the principles advanced, and the cases cited and commented upon, are very fully considered in the *opinions* delivered by the members of the court in pronouncing judgment; the CHANCELLOR and Senator SHERMAN delivering opinions for *reversal*, and Senators ALLEN, BEARDSLEY and MAYNARD, delivering opinions in *affirmance* of the judgment of the supreme court.

The following are the opinions:

By the CHANCELLOR. The facts in this case are few and simple; but the questions of law arising out of those facts are of sufficient importance to require the most deliberate exami-

Cram
v.
Hendricks.

nation of every member of this court. The same questions have already brought into exercise the highest judicial talents of this country and of England.

Cram, the plaintiff in error, held two promissory notes against Gomez, taken in the usual course of business, payable to his order at four months. A few days after the date of these notes, the payee endorsed and delivered them to his agent, a broker, to raise money thereon. The broker called on Hendricks, the defendant in error, who was the father-in-law of the drawer, and requested him to discount the notes, informing him at the same time that they belonged to Cram, and that they were offered for discount for his benefit. Hendricks discounted them, and gave his check for the amount, retaining to himself a premium at the ra te of 12 per cent. per annum, for the time the notes had to run. This suit was brought by Hendricks against Cram as endorser, the notes having been protested for non-payment by the drawer. The court below decided that the transfer of the notes was not usurious, as between the endorser and endorsee, and that the latter had a right to recover the amount actually paid by him for the notes, with legal interest thereon.

If the understanding of the parties was that Hendricks should loan to Cram a sum of money on the credit of these two notes, to be refunded out of the proceeds thereof when they became due, with legal interest only, and that he should account to the endorser for the surplus, if any, which should be received from the drawer, there could be no pretence of usury. The judgment of the court below in that case, would unquestionably have been correct. This is probably what was meant by Lord Kenyon in *Wiffen* v. *Roberts*, 1 Esp. R. 261, where he says, " The endorsee, who has only paid part of the amount to the endorser, may recover the whole of the acceptor, and will be the holder of the surplus for the use of the endorser." On the other hand, where a note, valid in its concoction, and which might be collected by the vendor from any of the previous parties, is *bona fide* sold at a discount, without any guaranty of payment on his part, if the transaction is not in fact intended as a mere cover for usury, the purchaser may recover the whole amount against the previous parties for his

own use; but in that case he has no right to resort to the vendor to recover back the purchase money, if the persons on whose credit he purchased the note fail. Even where the vendor puts his name upon the note for the mere purpose of transferring the legal interest therein to the purchaser, if the transaction is a real sale, and without any intention on the part of either that the vendor should guarantee the re-payment of the money, it perhaps could not constitute a case of usury, although the endorsement were in blank, the transaction being satisfactorily explained; but certainly the purchaser, under such circumstances, would have no equitable right to recover any thing against the vendor on his endorsement. If this is a case of the latter description, the question of usury may not arise; but it is equally decisive against the claim of the defendant in error to recover against the endorser, although it leaves Hendricks perfectly free to collect the note of the drawer, notwithstanding he is obliged to collect through that endorsement. If such was the intention of the parties, the holder has a right to fill up the blank endorsement, without resort to the endorser. This would of course obviate all objection to a recovery through such endorsement. The question then presents itself, can a party purchase a note, valid in the hands of the vendor, at a discount or premium beyond the legal rate of interest, and at the same time take from the seller a guaranty of the payment of the full amount of the note, or of the purchase money advanced, and legal interest thereon, without violating the laws against usury? It will be seen that this does not embrace the question whether the maker can object that the transfer of the note was usurious in a suit brought against him by the endorsee, or by a subsequent holder; that point only arises incidentally in this cause, although it has been fully discussed, the plaintiff in error insisting that he is legally entitled to the note, and that Hendricks has no right to collect it even of the drawer. Some judges have considered this last question as necessarily embraced in the first; and most of the cases to which I shall have occasion to refer, were either argued or decided on that supposition.

The earliest case I have been able to find, in which this question has arisen, is that of *Massa* v. *Dauling*, very loosely reported by Strange, and not to be found in any of the cotemporary reports. 2 Strange, 1243. That was an issue out of chancery, in a case of bankruptcy, to ascertain the legal liability of the endorser of two notes. It is stated to have been a suit against the endorsee; but that is evidently a mistake or typographical error. The first note was discounted at the rate of 12 per cent., and when it became due, another note was given for the same amount for three months longer, at the same rate. It was insisted this was not usury, but a purchase of the notes. Ch. J. Lee held it was usury, but submitted it to the jury to say whether it was to be deemed a purchase or a loan, and they found it to be the latter. It is impossible to ascertain precisely what were the facts in that case; but so far as its principles can be ascertained, it seems to be a decision that the person who transfers a valid note on an usurious agreement, is not liable on his endorsement. The first note was of that description; and although the second one, which extended the time, was clearly void for usury, that did not make the first void, unless the original transfer was also usurious. In that case the suit was on both notes; both were declared void, and the defendant had a verdict. In the case of *Parr* v. *Eliason*, 1 East's R. 92, the legal owner of a bill of exchange transferred it, at a small discount beyond the legal rate, as an acceptance at three months was taken in payment instead of cash, and he endorsed the bill to the purchaser, from which it passed into the hands of a *bona fide* holder. The seller afterwards brought trover for the bill, and it seemed to be admitted by the counsel and the court that the transaction was usurious; and so, as appears from the note of the reporter, he understood the case. But the court decided that the vendor could not sustain an action of trover to recover it back from a subsequent *bona fide* holder. In the case of *Lowes* v. *Mazeredo*, Com. on Usury, 175, Lord Ellenborough says he was counsel in the case of *Parr* v. *Eliason*, and that there was a great conflict of opinion on the subject at the time of that decision; but it was not on the question whether the transfer of the bill was or was not usurious—as to that there seems

to have been no doubt. The difference of opinion was upon the point whether a subsequent *bona fide* holder was not bound to deliver it back to the seller, and whether the latter could not recover it back in an action of trover, without paying or offering to refund what he had actually received on the sale.

In the case *Ex parte Isbester*, which came before Lord Eldon in 1810, 1 Rose's Cas. 23, the lord chancellor recognized the distinction between the mere discounting of a bill, with the endorsement of the person to whom the money is advanced, and a sale of the same instrument by a transfer thereof, without guaranteeing the payment by an endorsement. The same distinction is recognized and enforced more at length by Pothier, in the treatise on contract of sale, referred to on the argument of this cause. In discussing the question whether it is lawful to buy a debt against a third person for less than the amount due thereon, Pothier Traite du Contrat de Vente, Tom 2, pt. 6, ch. 4, art. 6, § 1, this distinguished jurisconsult says, there is no objection to such a purchase, either in law or in conscience, provided the solvency of the debtor is doubtful; and there is no contract on the part of the seller to guarantee the solvency of the debtor. He also admits that would be legal although the debtor was known to be perfectly solvent, if the vendor did not guarantee the payment. But he insists that in *foro conscientiæ*, the purchaser ought not to be permitted to avail himself of the seller's necessities, to obtain the debt for less than its real value. He also says, if the vendor of the debt becomes responsible that it shall be paid, in that case the purchaser cannot be permitted, either in conscience or in law, to buy the debt for less than the amount due thereon; that such a purchase is unlawful as a loan upon usury; for if I sell to you for 900 livres a debt of one thousand, which I engage to pay myself if the debtor does not, it evidently is the same thing as if you lend me 900 livres upon my engagement to return you 1000 at the end of a certain time.*

---

Lorsque le vendeur d'une creance la garantit bien payable, elle ne peut en cecas, dans le for interieur ni dans le for exterieur, etre licitement achetee pour un prix moindre que la somme due; un tel achat ne doit pas etre plus licite qu'un pret usuraire; car lorsque je vous vends pour neuf cents livres

In *Lowes* v. *Massaredo*, 1 Starkie, 385, the bill was discounted by Bloxom for the holder, and upon his endorsement; deducting a half per cent. commission and five per cent premium for the two months the bill had to run. The bill was afterwards transferred to a *bona fide* holder. In a suit by him against the acceptor the court decided that the transfer to Bloxom was usurious ; and that the acceptor could set up that defence against the holder, because the latter was obliged to make title to the bill through this usurious endorsement. The same principle was shortly afterwards recognized and again acted upon by the court of exchequer, in the case of *The King* v. *Ridge*, 4 *Prices's R.* 50 ; and by the court of king's bench in *Chapman* v. *Black*, 2 Barn. & Ald. R. 489. It may therefore be considered as settled law in England. The act of June, 1818, 58 Geo. 3, ch. 93, 2 Evans, State. 262, No. 6, has destroyed the effect of these decisions as to *bona fide* holders of bills or notes. It also protects the holder against usury in the original concoction of the instrument, of which he had not notice at the time of the assignment : but even that act would not extend to the case now under consideration, for it has been decided that if there has been any usury, either between the original parties to the note, or in any subsequent transfer thereof, the holder, to bring himself within the provisions of that act, must show affirmatively that he is a *bona fide* holder, and he must also have received the note without any notice of such usury. *Wyatt* v. *Campbell*, 1 Moody & Malk. 80 *Meagre* v. *Simmons*, *id*. 121. And see 1 Mann. & Ry. 204.

In the recent case of *Gaither* v. *The Farmers' and Mechanics' Bank of Georgetown*, 1 Peters' R. 37, the supreme court of the United States decided that the endorsment and transfer of a note was usurious, altthough it was a valid note as between the payee and the maker. That the note having been transferred as a collateral security on a usurious discount of other notes, the holder could not recover it against the maker, and that the endorsement was ineffectual for the purpose

une creance de mille livres, que je m'engage d'acquitter moimeme, si le debiteur ne la paie pas, il est evident que c'est la meme chose, que si vous me pretiez neuf cents livres, a la charge de vous en rendre mille au bout d'un certain temps.

even of transferring an interest in the note ; that it was a void act.

The case of *Ruffin* v. *Armstrong*, 2 Hawk's R. 411, was a suit by the purchaser against the seller, on his endorsement. It was like the present case, with the exception that the person to whom the payee entrusted the note for sale, had in that case express directions not to inform the purchaser to whom the note belonged, but to dispose of it as his own, and the supreme court of North Carolina decided that the sale at a discount, even under these circumstances, was usurious, and that the defendant was not liable on his endorsement. There the court do not question the principle that a bond or note may be fairly sold at a price far below its nominal amount ; but they say it is *the substance of the transaction* which must determine whether it was a purchase or a mere loan or advance of money, whatever it may be called by the parties. That by adding his endorsement, the defendant undertook on his part to repay the money advanced in the event of the obligor's delinquency ; and that the unequivocal characteristic of a loan is that the borrower is at all events liable for the repayment of the money.

In *Foltz* v. *Mey*, 1 Bay's R. 486, the superior court of common pleas in South Carolina seem to take it for granted that a sale of a note at a discount, with the endorsement of the seller thereon, is as to him usurious, although it was an effective note in his hands. But they decided that in a suit by a subsequent *bona fide* holder against the maker, the latter could not set up the usury between the intermediate parties to defeat the action, although the plaintiff was obliged to claim through the usurious endorsement. And a similar decision has much more recently been made by the newly organized court of appeals in that state, in the case of *Johnson* v. *King & Jones*, 3 McCords L. R. 365. See also the opinion of Judge Nott, in *Brown* v. *Fausset*, Harper's L. R. 82 ; and of Judge Golcock, in *Fleming* v. *Mulligan*, 2 McCords L. R. 175; and of Johnson, J. in *Harick* v. *Jones*, 4 id. 402.

In *Burt* v. *Gwinn*, 4 Harris & Johns. R. 507, the court of appeals in Maryland decided that where a note was *bona fide* in its origin, an innocent holder, without notice, might recover thereon, although it had been subsequently transferred up-

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

on an usurious consideration.   And in Kentucky, where seal-
ed notes are negotiable by assignment, it has been settled that
the assignee may recover against the maker, although the
note has been assigned on an usurious consideration.   There,
the party originally liable for the payment of the note or bond,
cannot take advantage of the usury as between the assignor
and the assignee.   *Little* v. *Hord*, Hardin's R. 81.

In the case of *Whitworth* v. *Adams*, which came before the
court of appeals in Virginia in 1827, 5 Rand. R. 333, a note
endorsed in blank was put into the hands of a broker to raise
money thereon.   It was sold by him at a discount, without dis-
closing to the purchaser that he was not the real owner.   In
a suit brought by a subsequent holder against the maker, three
out of the five judges held that the plaintiff was entitled to
recover, on the ground that the broker had not guaranteed
the payment of the note by endorsement, nor disclosed the
fact that he was not the owner selling on his own account.
That the purchaser had therefore reason to suppose it was a
real sale, and not a mere device to raise money on the note.
But they all agreed that if the broker had become liable to re-
fund the money, by endorsing the note, or had disclosed the
fact that he was selling it for the payee whose name was on
the note, it would have been a clear case of usury.   Carr, J.
says, " If the holder of a note transfer it without endorsing it,
the transaction is *prima facie* a sale ; and if it be a real sale,
and not a cover to evade the statute, the contract will be val-
id, though the discount be greater than the legal rate.   But
if the holder, when he parts with the note, endorses it, it be-
comes, substantially, a new security for money borrowed."
Judge Cabel says, " If the holder of a bill, originally payable
to bearer, or of a note or bill endorsed in blank, sells it at ever
so great a discount, *out and out*, that is, solely on the credit of
the other names upon it, (which implies that he neither en-
dorses it himself, nor makes any other engagement to be re-
sponsible for it in case of its dishonor,) such sale cannot be
impeached," &c.   Again : he says, " If the note had passed
from the payee to the person who paid the money, on a con-
tract of endorsement, by which the payee received for the bill
less than its nominal amount, deducting legal interest, I should

be decidedly of opinion that the endorsement was usurious and void." The opinions of the other judges are equally explicit on this point. This same principle was also recognized and distinctly stated by the late Chief Justice Parsons, in delivering the opinion of the supreme court of Massachusetts in *Churchill* v. *Suitor*, 4 Mass. R. 162, and by the present supreme court of that state, in the case of *Knight* v. *Putnam*, 3 Pick. R. 185. In delivering the opinion of the court in the last case, Wilde, Justice, says, that the transfer of a note on an usurious discount, being an executed contract, cannot be set up by the maker as a defence; but that the implied guaranty of the endorser, being an executory contract, may be avoided by the latter.

From this review of the cases, it appears that in most of our sister states which have adopted the English usury laws, as well as in the supreme court of United States, and in England, it is held that a sale of a note for less than its nominal amount, on an advance of money or other thing, in the nature of a discount of the note, is usurious between the parties to such transaction, if the seller endorses the note, or otherwise guarantees the repayment of the purchase money. But there is a great conflict of opinion on the question whether any person who was legally bound to pay the note to the seller can take advantage of such usury as a defence. None of the cases however extend to a sale of a note or bill payable at a different place from where the parties reside ; and where the discount or premium is merely intended to cover the difference in exchange between the two places, or the necessary expense of sending to the place where the money is payable, to receive the same, or to make a demand of payment, so as to charge the endorser, even Pothier expressly excepts that case from the operation of the rule of law, as declared by him in the treatise to which I have referred. In all such cases it is a question of fact for the jury to decide, whether the discount was made on that account only, or as a mere cover to an usurious advance of money. 4 Maule & Sel. 192. 1 Mad. R. 112.

The only case I can find, except the one now under consideration, in which it has been decided that a sale of the note at a discount beyond the legal rate of interest, and with the guar-

anty of the seller was not usurious as against him, is the case of *Lloyd* v. *Keach*, in the state of Connecticut. 2 Com. R. 175. That was not indeed a suit against the endorser to enforce the contract against him; but as the court decided that the drawer might take advantage of the illegality of the transfer, the case was in fact decided upon the question of usury alone. The cause was tried before Judge Hosmer, the present chief justice of that state, Judge Trumbull and Judge Gould, the distinguished head of the law school at Litchfield. They decided that where a man sells the note of a third person payable to himself, and endorses it over so as to become responsible therefor to the purchaser, if the sale is at a greater discount than lawful interest, it is usury; and under that decision the jury found a verdict for the defendant. On an application for a new trial, the question was argued before the nine judges of the court of appeals, and a bare majority decided in favor of granting the new trial. By referring to the opinions of the five judges who were in favor of granting a new trial, it will be seen that Ch. J. Swift puts his decision upon the ground that the charge to the jury was too broad. He says, "If a case can be stated in which such a sale would not be usurious then the charge was incorrect." He then supposes the case of the sale of a note against a man in Georgia, or the sale of bills of a distant bank, in which an extra premium might lawfully be taken for the expense of sending for the money, and the hazard of remittance. Two of the other judges concur in his opinion, without giving any reasons. Smith, J. thought the charge was incorrect, although the facts might be sufficient to warrant the jury in finding the contract usurious; and Goddard, the other judge, who admits he had some difficulty in making up an opinion in the case, finally concurred in favor of a new trial, on the ground that a part of the charge in which the court told the jury that if a man sold the note of a third person, payable to himself and endorsed it over, it was usury, was "too broad and unqualified." He also supposes the case of the sale of a note against a man residing in Baltimore, as one in which it would not be usurious to take an extra premium for the difference in exchange, and the expense of collection. He says further, that none of the cir-

ALBANY;
Dec. 1831.

Cram
v.
Hendricks.

cumstances, except that the note was sold at a discount beyond the legal rate, and was endorsed by the seller, are stated in the charge of the court, or in the case upon which the court of errors were called to give their opinion ; not even the amount of discount which was received. He admits the facts might be, and probably were sufficient to justify the result ; but as other facts than those stated in the case might and must have existed, he thinks the court should have stated the law to the jury, and left them to decide whether the transaction was or was not usurious under all the circumstances. On the whole, *Lloyd* v. *Keach* presents the case of a divided court, with a bare majority, admitting the general principles of law to be against the plaintiff, but struggling to seize hold of some technical objection to the charge of the court below to save from the penalty of the statute. If that was the only decided case on this subject, it would not be an authority on which we could safely rely in the case now before us. Here was no sale of a note against a man residing in Georgia or at Baltimore ; these notes were given in New-York, and payable there ; they were against the son in law of the purchaser, who, in the absence of all proof to the contrary, must be presumed to be where the endorser and endorsee both resided ; and the circuit judge was distinctly called on by the defendant's counsel to charge the jury that the facts given in evidence were sufficient to entitle him to a verdict, and to bar the plaintiff's action ; but the judge, on the contrary, told the jury the evidence was not sufficient for that purpose.

The case of *Braman* v. *Hess*, 13 Johns. R. 52, is relied on as an authority in favor of the defendant in error. In reference to that case it is only necessary to say the question of usury was not raised by the counsel, and probably was not even thought of by the court. The reporter would of course only state such facts as were material to the points before the court For aught we know, it may have appeared on the trial that the drawer of the note resided in a foreign country, or that it was payable at a bank in some of the eastern states. I presume the question of usury was susceptible of some satisfactory explanation, or that the defendant considered himself under an honorary obligation not to raise such an objection. In the

case of *Munn* v. *O. Ruggles*, 15 Johns. R. 57, judgment was given against the defendant for the amount which had actually been advanced to his agent on the bill, with interest from the time when it was advanced; but by referring to the facts in that case, it will be seen that Munn purchased the bill of Franklin, without any knowledge that he was selling it to raise money for any of the parties whose names were on the bill. It therefore came directly within the principle of the case of *Whitworth* v. *Adams,* in the court of appeals in Virginia, to which I have before referred. Although the endorsement, was void as a contract, being made for the purpose of an usurious sale on the credit of that endorsement, as well as of the drawer and acceptor, yet as the purchaser took the bill from the agent of Ruggles, and advanced his money under a supposition that the note belonged to such agent, who had a right to sell it for less than its face, the advance of the money was not usurious, nor was it advanced on an usurious agreement. The broker who sold the bill as valid, and upon the credit of the endorsement, but without informing the purchaser of the real facts in the case, had practiced a fraud upon Munn, or had impliedly guaranteed the legality of the endorsement. He was, therefore, himself liable to refund the purchase money; and having received the same as agent for O. Ruggles, the latter was also liable to refund it, as money had and received, to the use of the purchaser, when he discovered that the agent had thus palmed upon him a void endorsement. Although the making or endorsing of a note to be sold for the purpose of raising money at usurious interest is void, so that no action can be maintained on the written contract, it does not follow that a *bona fide* purchaser who has advanced his money to a party who did not guarantee the payment, but under the supposition that it was a real sale, is to be defrauded of that money. If the seller informs the purchaser that he is not selling the note on his own account, but for the benefit of a person whose name is on the note as drawer or endorser, then the purchaser is bound to know the transaction is usurious. In that case he advances the money at his peril; and cannot recover on the usurious contract; but if the holder sells it as his own without guaranty, and without giving the necessary information to

the purchaser, he is either guilty of a fraud upon the purchaser, or at all events is liable on the implied guaranty as to the legality of the note and endorsement, on the credit of which the purchaser advanced his money.

Upon every sale of a note there is an implied warranty on the part of the vendor that it is a legal note; that the parties whose names appear thereon as makers or endorsers are legally holden as such, and that the note has not already been paid. In other words, there is an implied warranty of the seller's title to the note, unless he gives the purchaser the requisite information to put him on his guard; but if the vendee has such information, he purchases at his peril, and at his own risk. In this case, if the broker had sold the note as his own, without informing Hendricks that the money was really advanced for the benefit of the endorser, the endorsement having been made for an usurious purpose, and not on a legal transfer of the note to the broker, the latter would have been liable to refund the money, either on account of the implied warranty, or of the fraud, if the purchaser could not legally recover of the parties whose names appeared on the paper; and probably the endorser, who had thus improperly obtained the money from the innocent vendee by means of his agent, would also have been liable as for so much money had and received to the use of the purchaser. By the application of these plain and obvious principles of law and natural justice, the laws of the state will be enforced, and innocent purchasers of negotiable paper will be protected against the frauds which are so frequently practiced upon them.

In deciding upon the validity of this contract of endorsement between the present parties, it appears to me to be wholly immaterial whether the note was or was not usurious and void in the hands of the payee. If the note was usurious and void in the hands of the original payee, or was even a forgery, yet if he had endorsed it to Hendricks for a full consideration, the payee could not have set up the invalidity of the note in an action brought against him on his endorsement, although the endorsee could not have recovered against the person whose name appeared on the note as drawer. So on the other hand, if the note was good in its inception, and was a valid security

in the hands of the payee, that is no answer to the alleged charge of usury in the agreement for the subsequent endorsement of the note, when the suit is brought on such subsequent endorsement and upon the new contract between the parties to that transfer.

It is said, however, that here was no loan or forbearance of money, within the meaning of the statute; but I apprehend the legal effect of the transaction amounts to a direct loan of the money advanced by Hendricks for the term the notes had to run; and if the money had been received from a bank instead of an individual broker, I think no one could have hesitated in calling it "*a loan or advance of money*" on the discount of the notes. Even the parties themselves did not call it a sale of the notes. The witness says he was employed to *raise money* on the notes; that he called upon Hendricks to *discount* them for the use of the endorser; and he agreed to discount, and did discount them at the rate of one per cent. per month. This is the only evidence on the subject, and it is perfectly immaterial by what name the transaction was called by the parties; for, when its legal effect is ascertained, the law must decide the question whether it was a sale or a loan. The legal effect of the contract, upon the face of the written agreement, is to transfer the notes to Hendricks, under an obligation on the part of Cram, not merely to refund the amount advanced and the legal interest, but to pay the whole of both notes if they should not be paid by the drawer when they arrived at maturity; and that would have been the amount of the recovery against Cram in this suit, if he had not appeared and defended the same. But as the supreme court say that the endorser may show he has not received the full amount of the note from the endorsee, the legal effect of the agreement, if valid, would be to give the whole amount of the notes to Hendricks if he could collect them of the drawer, with a guaranty on the part of Cram that he would, at all events, see that the amount advanced, with legal interest thereon, should be refunded to the endorsee. This is the definition of a loan as given by Baron Pennefeather, in *Byrne* v. *Kennifeck*, 1 Batty's R. 273, when he was pointing out to the jury the true distinction between a loan and a sale. He says

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

that to constitute a loan, there should be a stipulation on the part of the borrower that he should either re-pay the principal himself, or procure it to be re-paid. In the case of *Fireday* v. *Wightwick*, 1 Tamlyn's R. 250, where money was advanced on the purchase of an annuity, the payments of which depended on no contingency, so that in the end, if those payments were made, the person advancing the money would have his purchase money refunded with more than five per cent. interest, the master of the rolls pronounced the legal effect of the transaction to be a loan of the money advanced, and that the contract was usurious.

This case is not properly likened to the warranty of the title or goodness of a chattel on the sale thereof; but it more properly resembles a sale of a chattel under an agreement to warrant the purchaser a higher price therefor on a subsequent re-sale ; and if a man, for the purpose of obtaining money on the sale of a horse, should agree to warrant the life of the horse for a limited period, and that upon a re-sale at the expiration of that time, he should produce sufficient to re-pay the money advanced with ten per cent. interest, over and above all expenses, it wovld in law unquestionably be a usurious loan of the money advanced on the sale.

It is evident from the opinion of the supreme court, with which we have been furnished, that the cause now before us was passed upon there without much examination, in the hurry of business, and under a supposition that the question had already been decided ; and as the opinion shows also, under a mistaken supposition, that the decision of the court of king's bench in *Lowes* v. *Mazzaredo* had never been recognized or followed in England. The attention of the court does not appear to have been directed to the distinction between a suit between the parties to an usurious transfer, to enforce the liability incurred by the endorsement, and a suit against another person who was not interested in, or a party to the illegal contract.

The question as to the right of the *maker* of a note to set up usury in the subsequent transfer as a defence, is the only one, as I understand the subject, in which there has heretofore been any difference of opinion, or clashing of decisions, in the

courts of this country. There appears to be plausibility, at least, in the distinction taken by Judge Wilde, that is, in considering the endorsement and delivery of the note as an *executed* contract, so far as regards the transfer of the right of action against the maker, but as *executory*, merely, in relation to the liability of the endorser under his implied guaranty by the endorsement. This distinction between executed and executory contracts, tainted with usury, seems to be recognised in *Ackerly* v. *Finch*, 7 Cowen, 290, and in *Parr* v. *Eliason*, before referred to. And it is on this principle, alone, that the decision in *Rice* v. *Mather*, 3 Wendell, 62, can be sustained. The " cobweb covering" which the parties attempted to throw over that transaction, being much too thin to conceal its real nature, as between the endorsers and the purchaser. The party who has transferred a note at an usurious discount, may not wish to avail himself of the illegality; and sometimes it may be even for his own interest that the holder should be permitted to recover against the maker. In ordinary cases it does not lie in the mouth of the maker of a note to object that the person in whose name the suit is brought has no interest in the note, or has received it without consideration, if the suit is not prosecuted against the consent of the real owner. But as this point is not necessary to the decision of this cause, I have not considered it sufficiently to make up any definite opinion on the subject. It may be necessary to follow the decisions of the supreme court of the United States, and of the English courts, to carry into effect the intention of the legislature. I shall therefore leave it until I shall be obliged to pass upon it in the regular discharge of my official duties.

It is not the trifling sum of one per cent. a month, taken on the discount of these notes, which renders this case important, but it is the principle which it contains. Nor should the circumstance that the amount of discount was not unreasonable, in any way influence our decision on an important question of law, in which the interests of the whole community are involved. If this transaction was legal, so as to make the seller liable on his endorsement to the purchaser, he would have been equally holden if twenty times that amount had been deducted. Once establish this principle, and brokers and money

lenders will be permitted to fleece the community without risk, and without mercy. The whole of the business paper of the state, instead of being discounted by the banks at the legal rate of interest, may then be discounted by their secret agents, at extravagant premiums, under the name of purchases, without risk of loss. Nay, more; if business paper may be lawfully discounted by an individual, or a money broker, what is to prevent its being discounted in the same way by the Fulton Bank, the Manhattan Company, the Bank of Rochester, and several other institutions, which are subject to no restriction, as to the rate of discount, except that which is composed by the usury laws upon individuals, as well as upon corporations? Previous to the passage of the act of the 2d of April, 1829, usually denominated the safety fund law, the only restriction imposed upon most of the incorporated banks by the provisions of their charters, as to the discount to be taken, was limited to bills and notes which had not more than sixty days to run at the time they were discounted. And the same restriction (extended only to notes and bills which are payable at sixty-three days, or within that time) is now incorporated into all the charters which have been granted since the passing of that act. Laws of 1829, p. 173, § 33. With the exception, therefore, of the Commercial Bank of Albany, and a few others, which, by the express terms of their charters, are prohibited from taking more than a limited amount of premium on *any* loan or discount, there is nothing but the general laws against usury to prevent any of the sixty incorporated banks in this state from taking any premium they may choose to exact upon the discount of bills or notes which have more than sixty days to run, at the time of such discount. Let it then once be established by the decision of the highest judicial tribunal in the state, that the discount of business paper, at more than seven per cent. and with the endorsement of the holder or other collateral security, is not usurious, and in a time of scarcity it will not only be found by those who are in need of money that corporations have no souls, but they will also have reason to think some of the directors of such institutions suppose themselves to be in the same situation. I do not make these suggestions

because I believe bank directors, or money lenders, are worse than any other class of society; on the contrary, I know that many of them are among our most worthy and valued citizens, but in settling important principles of law and public policy, we must take human nature as it really is; and the experience of ages has shown the necessity of protecting the distressed and needy borrower against the more fortunate lender, who easily persuades himself that an extravagant premium for the loan is both just and equitable.

It is no answer to the charge of usury, in cases like the present, that the endorser, as between himself and his immediate endorsee, is only liable for the sum advanced and legal interest. Such would also be the effect of an ordinary loan of money on the borrower's own note, if he gave, by way of extra premium to the lender, a note against a third person, to collect at his own risk. Whenever the lender stipulates even for the chance of an advantage beyond the legal interest, the contract is usurious, if the money advanced and legal interest thereon are to be refunded at all events. 5 Dow. & Ryl. R. 116. 17 Ves. R. 46. 3 Barn. & Cress. 273. 1 Moody & Malk. R. 411. In this case the purchaser had the chance of getting the whole amount, including the usurious premium, from the drawer of the notes; and if he failed, the endorser would be liable, at all events, to pay the amount advanced, and legal interest for the use thereof in the mean time. Suppose the endorsements on these notes had specified, in terms, what the counsel for Hendricks now contends was their legal effect as between these parties, the contract would, in that case, have run thus: " Whereas H. Hendricks has this day advanced to me the amount of this note, deducting a discount at the rate of twelve per cent., I therefore, in consideration of such advance, assign over to him the within note to collect and receive of the maker the whole amount thereof, to his own use; and I agree that if the same is not paid by the maker on the day the note falls due, I will return the amount advanced, and legal interest, provided payment is duly demanded, and notice of the non-payment of the note is given to me by the holder." This is clearly a stipulation for a contingent profit beyond the legal rate of interest; and accompanied by

a. guaranty that the principal and legal interest shall be repaid, at all events. If such an agreement was set out at large in a written contract, or in the condition of a bond and mortgage given by the seller, could any person hesitate in saying it was clearly usurious, as between the parties thereto? But the case does not rest here; the legal liabilities of Cram on this endorsement, and the benefit to Hendricks, would be still greater. The purchaser takes an endorsement, which, *prima facie*, entitles him to recover the whole amount of the notes from the endorser. If he retains them in his own hands, and the endorser can produce evidence that less than the whole amount was in fact advanced, the recovery will be limited to that sum. But if the endorsement is not usurious, what is to protect the endorser from liability for the whole amount, including any premium, however exhorbitant, which may have been retained, provided the purchaser chooses to transfer the notes to a bona fide holder, or has them discounted at a bank for his own benefit?

I know the usury laws present many hard cases; and that juries, and sometimes even courts, struggle to take particular transactions out of the operation of the statute. I am not, however, prepared to say this is one of those cases. It is evident from the testimony that Hendricks took these notes principally, if not wholly, on the credit of his son-in-law, and he may have the means of enforcing payment from him, if driven to that necessity, of which a stranger could not avail himself. We all know that in cases of failure, debts due to relatives are usually first provided for. I know nothing of the circumstances in this particular case; but if the assignment of the notes was not absolutely void, even as against the maker, it does not necessarily follow that Hendricks will lose his money although Cram may not be liable as endorser. But admitting this to be a hard case against the purchaser only, and whatever may be our private opinions as to the policy of the usury laws generally, as judges it is our duty to carry into effect every constitutional law passed by the legislature. We cannot, without an usurpation of their powers, and a violation of our duty, alter the law, or make a decision, which would operate as a virtual repeal, and subject the community to all the evils

against which the legislature intended to provide. If the law is wrong, either in principle or in any of its provisions, the members of this court, who are senators, have the power elsewhere, to apply the constitutional remedy.

I have long thought it would be good policy, and probably a great benefit to that class of community who borrow money, not for the purposes of speculation, but who are compelled to procure it to prevent a sacrifice of the property, to modify the usury laws, so as to enable the lender to accept a small premium on the loan beyond the usual rate of interest, without subjecting him to the absolute forfeiture of the whole debt. Various shifts are now resorted to for the purpose of evading the statute, and the borrower is always compelled to pay the extra expense of the contrivance, together with a large addition thereto, to cover the risk or chances of detection and loss. The statute having declared it illegal to receive more than seven per cent., many conscientious monied men will not violate the law, and in times of scarcity, they resort to other means of making their capital productive. In such cases, the man who is pressed for money is of course thrown into the power of those who are willing to make the most of his necessities. Perhaps on a loan of money for a limited period, the lender might with safety be permitted to take a contract in writing, stipulating for the payment of one or two per cent. beyond the usual rate, as fixed by law, and to enforce the collection thereof in a court of justice. Even that, however, would be a measure of doubtful policy. But the effect of the decision of this cause in favor of the defendant in error, and without any alteration of the existing law, would be to enable a money lender, by a mere shift or device, to stipulate for any premium his conscience would permit him to ask, and to which the necessities of the borrower might compel him to submit; and by another device, equally easy and safe, the collection of the whole amount might be legally enforced.

The laws of most civilized nations show that they have considered it unsafe to leave the necessitous borrower in the power of the lender. By the law of *Moses*, the Jews were prohibited from lending money upon usury to their brethren; though they were allowed to exact any rate of interest which

they could obtain from strangers, the inhabitants of the sur-
rounding nations, against whom the divine vengeance was
denounced, on account of their idolatries and abominations ;
but under the gospel dispensation, which teaches us to consid-
er and treat all mankind as our brethren, every kind of lend-
ing upon usury is most unequivocally condemned.   Long be-
fore the introduction of christianity among the Romans, their
laws also had prohibited the lending of money upon usury,
and they punished it even more severely than the crime of
theft, although judicial interest was allowed for withholding
the payment of the money loaned, after the expiration of the
stipulated time.   This law was subsequently altered so as to
allow a limited compensation by way of interest on the loan
of money ; and with various modifications, it still exists as the
law of those countries which have derived the fundamental
principles of their several codes from the ample stores of the
civil law.   1 Domat, 128.   1 Bro. Civ. & Adm. Law, 376.
Inst. Law of Spain, 283.   Van Der Linden's Inst. 318, § 3.   1
Bell's Com. 308.   Neither have these regulations, as to the
rates of interest to be taken on loans of money, been confined
to the Jews, and to those nations usually denominated civil-
ized.   By the laws of China, interest on a loan is limited to
a certain rate per month, and whatever may be the term of
credit, the lender can in no case recover interest exceeding
the amount of the original debt, on the principal of the sum
loaned.   Staunt. Law of China, 158.   So by the institutes of
the Emperor Akber, a descendant of Tamerlane, and who
gave law to a vast empire in Asia two hundred and fifty
years since, the amount of interest on a simple loan was fixed
at a certain rate per month, according to the rank of the parties
to the loan ; and for a loan upon security or deposit, the inter-
est was but one fourth of the amount allowed on a simple loan,
and, as in the laws of China and of Rome, interest was in no
case recoverable beyond the amount of the sum lent.   1 Glad-
win's Ayeen Akbery, 471.   So also, by the present law of the
Hindoos, their rate of interest is fixed according to the rank of
the parties ; the highest interest being payable between per-
sons of the lowest caste, and the rate of interest allowed on
simple loans being higher than that allowed on loans upon

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

deposit, &c.   1 Strange's Hindu Law, 297.   With such evi-
dences before us of the common understanding of mankind on
this subject, and in all ages of the world, can it be doubted
that the needy borrower must to a certain extent be protect-
ed against himself, and against the disastrous effects of his
own improvidence ?

It has frequently been urged that money is a fair subject of
merchandize; that like every other subject of commerce, its
value should be left to regulate itself, and that there is no
reason why the owner and the borrower should not be permit-
ted to make their own contract for the hire of money, in the
same manner as they may contract for the sale or hire of any
other kind of property.   This is all very well in theory ; but
as has been justly remarked, in relation to this subject, by one
who had made the trial, " experience often proves that what
appeared to be the soundest calculation of the human mind as
to moral causes and effects, is but folly."   Influenced by such
reasons as I have often heard urged, the legislature of one of
our sister states a few years since tried the experiment of let-
ting the value of money regulate itself.   But in the strong and
forcible language of the chief justice of that state, who had
himself advocated and voted for the passage of the law, " a
most fearful and disastrous experiment" it has indeed been
found in that case.   The first volume of the *Alabama Re-
ports* shows that contracts have been made under that law
which have rendered the fictions of a Shakespear's imagina-
tion almost realities.   In one case on a loan of $3000, the
interest, alone, amounted to $3261 in less than fifteen months.
In another, a debt of $4200 was swelled to the enormous sum
of $28,770, in a period short of five years.   And on some
smaller loans the interest exacted was much larger in pro-
portion.   1 Alab. R. 212.   To use the figurative language of
the great dramatist, who had such intimate knowledge of hu-
man nature, the courts of that state have been called upon
to mete out to the merciless creditor the pound of flesh, and
that too, nearest the heart.   Nay, they have found them-
selves compelled by law, to award to him as it were, the very
heart's blood of the unfortunate debtor, because they found it
plainly stipulated for in the condition of the bond.   The de-
sire of gain is the same here as elsewhere ; and I trust that

under the existing law this court will not find itself compelled, <span>ALBANY,<br>Dec. 1831.</span> nor feel itself authorised to make a decision in this case, which in its consequences will place the borrower so perfectly in the power of the lender.

Cram<br>v.<br>Hendricks.

I think the judgment of the court below should be reversed, and that the defendant in error should be left to seek his remedy, if he has any, against the maker of the notes.

By Mr. Senator ALLEN. It is not disputed, that if a person loan money at a higher rate of interest than seven per cent. the transaction is usurious; but there is a wide distinction between the purchase of a security, that is free from usury in its inception, and the loaning of money. A bill of exchange may be taken to market and sold for any price that can be obtained, and though the price obtained bear no proportion to its value, if it is cashed upon the legal terms of discount, the purchaser is nevertheless not guilty of usury. 4 East, 57. In the present case, it appears to me, the transaction was nothing more than the sale of a security; for although Healy the broker, calls it the discounting of the notes, it only amounted to the retention of a sum over and above the interest that was deemed by the purchaser a sufficient remuneration for the risk he would incur by insuring the solvency for three months of the drawer and endorser.

The act for preventing usury, according to my understanding of it, never was intended to embrace a transaction like the one now before this court; for the terms *discount* or *sale* are not even named in its prohibitory provisions. The language is, that no person shall take for the *loan of any money* more than seven pounds for the forbearance of one hundred pounds for one year, and so for a greater or lesser sum, or for a longer or shorter time; nor take any bond for payment of money *to be lent.* There is, therefore, no prohibition of the sale of securities, such as those alluded to in this case. That the courts of this state have understood the act as prohibiting absolute loans only, at an interest of more than seven per cent. per annum, and not the sale of a security, is quite evident from the numerous cases in our books. The first case I have found reported, in which the principle was recognized

that an endorsee who had purchased a note for more than legal interest, may recover from his immediate endorser the amount he has paid for the note, is that of *Brown* v. *Mott*, 7 Johns. R. 361, where it was observed that if the plaintiff had purchased the note at a reduced price, he could not recover from the endorser more than he paid for the note. This cause was decided in 1811. In that case, the question before the court was not a question of usury, and the observation, therefore, came up incidentally; it nevertheless shows the opinion of the court on the subject as truly as though the question then to be decided had been on a plea of usury, and this is abundantly shewn by the decisions in every subsequent case which has occurred from that time to the present. In *Braman* v. *Hess*, 13 Johns. R. 52, the action was on a note for $343,25, drawn by one Williams in favor of the defendant and John Yerdan, and by them endorsed to the plaintiff, by whom ninety dollars less than its face was given for it. The supreme court held that where, on the endorsement of a note, the consideration passing between the endorsee and his endorser is not equal to the amount of the note, the endorsee in an action against the endorser can only recover the consideration he has paid. The next case was *Munn* v. *The Commission Company*, 15 Johns. R. 44, where the court *held*, that where the note is valid as between the maker and the payee, so that the latter can maintain an action upon it against the former, it is valid in the hands of the endorsee, who has discounted it at a higher rate than the legal rate of interest, and he may recover the full amount of the note against the maker; but the holder of a note, purchased at a discount greater than the legal rate, can only recover from an endorser the sum which he actually advances. The late Chancellor *Jones*, in delivering his opinion in this court, in the case of *Powell* v. *Waters*, 8 Cowen, 669, observed, that a note which has been negotiated by the maker, and might at maturity be enforced against him by the holder, may be sold at a greater discount than the rate of seven per cent. per annum, but the note must be perfect and available to the holder, to make it saleable by him. The test is, the right to maintain an action upon it against the parties to it, if it was then due. In the same case,

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

Senator *Colden* observed, when a note or security is originally given for a legal consideration, it cannot afterwards become usurious at whatever rate it may be purchased or discounted. If a note be given for a usurious consideration, or is usurious in its origin, it is utterly void in whosesoever hands it may be. *Rice* v. *Mather*, 3 Wendell, 62, is a recent case decided in 1829, and proves conclusively that the principle has uniformly been acted on in every case which has come up for adjudication from 1811 to the case now before this court. This was a note drawn by E. Mather & Co. for $948,50, in favor of, and endorsed by Keeler and Mather, and discounted by the plaintiff at the rate of one per cent. a month for the time the note had to run. The defendant pleaded usury, but it was *held*, that according to the uniform decisions of this court, it clearly was not usurious transaction; it was an available instrument in the hands of the original payee ; there was no usury in its original concoction, and therefore the purchase of it, or the discount of it, at a sum less than the face, does not taint the note itself with usury. Usury, to invalidate the note, must exist between the original parties to it. There is nothing, that I am able to perceive, to distinguish these cases from the one now under consideration. There was no usury in the origin of the notes of Gomez; they were perfectly valid as between him and the payee, Cram, who might have maintained an action on them against Gomez; and had Hendricks, the endorsee, commenced an action against the maker, he would have recovered for the whole amount; but as his action was against the endorser, he could only recover the sum advanced by him with legal interest. This has in fact been considered the settled law of this state, and in no case which has come under my observation has it been overruled.

As I deem the decision of this question important, particularly as affecting the commercial transaction of this state, I have concluded to take a brief notice of a few of the cases commented and relied on by the counsel for the plaintiff in error; and although I have found in the various opinions delivered by the judges, occasional observations favoring the doctrine attempted to be established by the counsel for the plaintiff, there is but one of the numerous authorities referred

to, all of which I have examined, that would seem to have a direct bearing in favor of that doctrine. The case of *Loyd* v. *Keach*, 2 Conn. R. 175, was attempted to be invalidated, on the ground that it was not a unanimous decision of the court but if this objection is to have any weight, there would be but few of the questions adjudicated in this court that could be relied on as precedents. It appears, however, notwithstanding the decision alluded to was not by the unanimous voice of the whole court, that it has nevertheless been considered as the settled law in Connecticut, for in the case of *Tuttle & Hall* v. *Clark*, 4 Conn. R. 153, decided several years after that of *Loyd* v. *Keach*, the same principles were fully recognized. In *Loyd* v. *Keach*, Chief Justice Swift held, that to constitute usury, there must be a *loan :* and that a real sale without any intent to loan, though it may be oppressive, cannot be usurious. Promissory notes are as much the subject of sale as any other property ; they may be sold at any discount, and they may be sold either with or without warranty. But the argument relied on is, that the endorsing and warranting a not is drawing a bill of exchange, and the drawing a bill of exchange for more than is received, is usurious. There is no question but that the endorsing and warranting a note is like drawing a bill, as it respects the obligations and liabilities created by it ; but to make the analogy complete, we must consider it to be the sale of a bill of exchange at an extra discount for if the endorsing and warranting a note is drawing a bill, then selling a note so endorsed and warranted, is selling a bill. It is manifest that no article is more properly the subject of sale than a bill of exchange ; that the price depends on the demand, as well as various other circumstances, like all other property. This, as it respects foreign bills, is not questioned ; but it is insisted that there is a difference between foreign and inland bills, owing to the different circumstances under which they are negotiated. There is, however, no ground for such distinction, where there are reasons to justify it ; an inland bill may be sold at an extra discount as well as a foreign, and in many cases the same reasons for such discount may exist in both kinds of bills. This opinion, pronounced by a man of acknowledged legal attainments, is worthy of great

respect, especially as it agrees in every essential particular with the principles advocated by our own courts. His reply to the argument, that the endorsing and warranting a note, is drawing a bill of exchange, is unanswerable, and his observations generally on the distinction between a sale and a loan are so conclusive to my mind, that it is with difficulty I am enabled to anticipate a doubt as to their correctness.

*Herman* v. *Sprigg*, 3 Martyn, 190, was relied on as an authority for the plaintiff. The decision in that case was, that contracts, in which usury intervenes, are void ; but the lender may recover back the money loaned. The borrower is not obliged to pay legal or other interest on money received on a usurious contract. This case was decided in the courts of *Louisiana*, where it is held that the lender may recover back the money loaned, even if the contract was usurious, but the borrower is not compelled to pay any compensation for its use. How is this a decision in favor of the plaintiff, when he contends he is not bound to pay any portion of the money received ?

In *Parr* v. *Elaison*, 1 East, 92, the question was, whether usury between the holder of a bill drawn payable to his own order and the person to whom he endorsed it, for a usurious consideration, avoided the bill in the hands of an innocent holder. Lord Kenyon observed, the commerce of this country subsists upon paper credit, but if this action could be maintained, no man would be safe in taking even a bank of England post bill, payable to order, for however just and legal it might be in its inception, if the payee passed it to another for a usurious consideration, it is now contended it would be void in the hands of any subsequent innocent holder, and might be recovered from him. If the bill itself in its original formation is given for an usurious consideration, the words of the statute are peremptory. Here the bill was fair and legal in its concoction, and therefore no advantage can be taken of what happened afterwards, against *bona fide* holders.

In *Daniel* v. *Cartony*, 1 Esp. 274, Lord Kenyon observes, if the note had originally been given on a usurious transaction, or for a usurious consideration, it would have been void even in the hands of a *bona fide* holder : but usury in any interme-

diate transaction respecting it, can never make it void in the hands of a *bona fide* endorsee, where there was no usury in the original transaction.

In *Wiffen* v. *Roberts*, 1 Esp. 260, it was held that when a bill of exchange is given for money really due from the drawee to the drawer, or is drawn in the regular course of business, in such case the endorsee, though he has not given to the endorser the full amount of the bill, yet may recover the whole, and be the holder of the overplus beyond the sum he has really paid to the use of the endorser ; but where the bill is an accommodation one, and that known to the endorsee, and he pays but part of the amount, in such case he can only recover the sum he has actually paid.

*Ferral* v. *Shaen*, 1 Saund. 295, was a suit on a bond for £300, dated in May, and payable in February thereafter. The bond not being paid when due, the defendant for a delay of payment, paid the plaintiff £30, which was much more than the legal interest. He pleaded the statute of usury. The court held if the bond was legal at the time it was made, no subsequent event could make it usurious. Here the bond was not for the payment of money upon, or for usury, but for any thing which appears to the contrary, it was made for the payment of a just debt ; and so the bond was good when it was made. An usurious contract afterwards, cannot make a bond void which was good when it was made.

Here are four cases decided in the English courts, upon which reliance has been placed by the plaintiff in error, to show that the law in that country is, that an endorsee purchasing or discounting a bill free from usury in its origin, for less than its face, cannot recover of his immediate endorser. But what are the facts ? In the first case, the question decided was, that usury between the endorser and endorsee did not avoid a bill in the hands of an innocent holder. In the second, if there is no original usury in the note, no intermediate transaction can make it void in the hands of a *bona fide* endorsee. In the third, that the endorsee of a bill drawn in the regular course of business, though he has not given to the endorser the full amount of the bill, yet may recover the sum he actually paid for it. And in the fourth, if the bond was legal

when made no subsequent event can make it usurious. None of these questions are precisely the one under consideration; but instead of establishing the doctrine contended for by the plaintiff in error, they go far in support of the law as settled by the supreme court of this state.

There were numerous additional cases referred to; but I am unable to perceive that they have any manner of reference to the question before this court, further than that they were decided to be usurious contracts. The counsel for the plaintiff in error, however, seems to have deemed it necessary to call up every case reported on the subject of usury, from the black letter books of olden times, to the latest English reports received in this country. A great number of the cases alluded to are such as would not create a doubt as to their character; they do not relate to the sale of a note or other security, given for a valuable consideration, but to loans made on paper, purposely created for the raising of money, at any rate, or terms, upon which it could be had on such security. Such as the following: *The King* v. *Ridge*, 4 Price, 50. In this case, Lord Moira drew four bills for £1000 each, payable to his own order, which were accepted by Ridge, one of his household, and endorsed by Moira, and then handed to a confidential friend, who had been in the practice of obtaining money for him through the medium of such bills; he had them discounted, and received for the four bills £3600, which he handed to Moira. The bills were drawn payable in twelve months after date, and the amount deducted was at the rate of ten per cent. per annum. Here the bills were evidently made for the purpose of raising money by loan, and the transaction, therefore, was usurious. *Wilkie* v. *Roosevelt*, 3 Johns. Cas. 66. This was an action against the defendant as endorser of a note made by Marks & Co. payable to him. The note was made for the purpose of raising money, and was sent to Goodrich, a broker, who had been in the habit of receiving notes from Marks & Co. for the purpose of discount. Goodrich discounted the note at the rate of three and a quarter per cent. a month, and it afterwards came into the hands of the plaintiff. The court *held*, that the transaction was originally, and in its inception, usurious, between Marks & Co. and Good-

rich; and the transaction, in its inception, being usurious, the note was void. *Dunham* v. *Dey*, 13 Johns. R. 40. The facts in this case were briefly as follows: Dunham gave Ward his notes, amounting to $9000, and took from Ward his notes for the same amount, for which exchange he charged two and a half per cent. or $225, equal to one per cent. a month, for the time the notes had to run. The court *held*, that the amount retained by Dunham, as commission, was a shift to evade the law, and under all the circumstances of the case, could be viewed in no other light than the taking of usurious interest for the loan of his notes. In *The State Bank of New-Jersey* v. *Ayres*, 2 Halstead, 130, it was *held*, where a bank discounts a note at usual rate of interest, and pays for it post notes at 45, 60 and 90 days, as cash, the note discounted is usurious and void. *Whitworth* v. *Adams*, 5 Randolph, 333, and *Meagoe* v. *Simmons*, 1 Moody & Malkin, 121, were also cited, although the transaction in the first case was on a note usurious in its inception, being accommodation paper, made for the purpose of raising money, but it having been purchased by a person having no knowledge of its character, the transaction was decided not usurious. The second decides that the retention of a usurious premium, by the person procuring the discount of the bill, and no proof that the owner knew of the fact, or that he had retained more than interest, the transaction was not usurious. None of these cases, that I am able to perceive, have any analogy to, or bearing upon, the question under consideration, and they must have been cited, therefore, more for array than effect.

The two cases most relied on by the counsel for the plaintiff in error were *Lowes* v. *Mazzaredo*, and *Ruffen* v. *Armstrong*; and I will now proceed to notice their applicability to the case before us. *Lowes* v. *Mazzaredo*, 1 Starkie, 385, was an action by the endorsees, against the acceptor of a bill of exchange, drawn by G. Lowes to his own order, on defendant, at two months, for £1000, endorsed by G. Lowes to Bloxham, who discounted it for more than the legal interest. Bloxham passed the bill to Ambrose, and he passed it over to the plaintiffs. It was adjudged to be a usurious transaction. This case was much relied on as a decided authority for the plain-

tiff in error; but it only tends to show that the English courts have not, uniformly, held to the same principle in deciding causes under their statute of usury. The action in this case was against the acceptor of the bill, and the acceptor of a bill of exchange stands in the same relation to the endorsees that the maker of a promissory note does; they are both the promissors of payment, and their obligations, therefore, are the same. The transaction differs from the one before us, as the suit there was against the endorser, and not the drawer; and from the report of the case in Starkie, I am unable to determine whether the bill was accepted for a valuable consideration or not; it may have been an accommodation bill, for the purpose of raising money on loan, and not a valid transaction. The drawing of the bill by G. Lowes, payable to his own order, and the exorbitant interest paid for its discount, of six per cent. to Bloxham, besides a commission to the plaintiffs, are certainly indications of invalidity, which I think will at least authorise a rejection of this case as an authority in favor of the plaintiff in error.

*Ruffen* v. *Armstrong*, 2 Hawkes, 411, was a joint sealed obligation of three persons, promising to pay Armstrong $911,28, payable on demand, one year after the 13th of September, 1819, with interest from the 10th of December, 1819. Armstrong, being desirous to raise money, and having been informed by his clerk, Halcom, that Ruffen was in the habit of buying notes, he endorsed the obligation to Halcom, and told him to sell it to Ruffen as his own property. He accordingly did sell the note for $600, representing it to be his own, and endorsed it over to Ruffen without recourse to him. The money received was immediately handed to Armstrong. The transaction was held to be usurious. This case, as I think, is the only one to be found in the books of reports that has the appearance of deciding the law, in opposition to the law as held by the courts of this state. It arose in the state of North Carolina, and differs from the one before us in the following particulars: 1. The instrument is not properly a note of hand, but a bond or specialty; and 2. It was sold or discounted as the property of Halcom, the clerk of the defendant in the suit, and not as the property of Armstrong, who

received the money paid for it. There was no communica-
tion between Ruffen, who discounted the note, and Armstrong,
the real owner, but the dealing was wholly with Halcom,
who represented himself as the owner of the note. There are
some peculiarities in the opinion delivered in this case, which
to me are unaccountable. The judge quotes, as applicable to
the case, the opinion of Judge Spencer in *Munn* v. *The Com.
Company,* and observes that the opinion of a late distinguished
judge in a sister state is so applicable to his view of the sub-
ject, and conveys his sentiments so much more conspicuous-
ly than he could have expressed them, that he begs leave to
quote his words : "I take it to be clear, that if a bill or note
is made for the purpose of raising money upon it, and it is dis-
counted at a premium higher than the legal rate of interest,
and when none of the parties whose names are on it can, as
between themselves, maintain a suit on the bill when it be-
comes mature provided it had not been discounted, that then
such discount of the bill would be usurious, and the bill would
be void." Are we, then, to conclude that the note signed and
sealed by three persons, and made payable to Armstrong, was
made for the raising of money upon it ? and could not Arm-
strong have maintained a suit against the makers of the note ?
If these are facts, and I am unable to see how any other con-
clusion can be arrived at, then the note was accommodation
paper, and the case of course cannot be relied on as a prece-
dent for the plaintiff in error. Chief Justice Taylor, in deliv-
ering his opinion in this case, took occasion to observe, that the
policy of the law against usury is as powerful now, under the
improvement, population and commerce of the state, as it was
a century ago, when the law was passed. These are strange
sentiments in this enlightened age. To suppose that the
same rigid rules of construction are as necessary now, when
the trade, commerce and population of the country have been
trebled, and its capital increased in the same proportion as
when it was almost without trade of any kind, with little cap-
ital or enterprise, and a sparse population, is contrary to the
experience of every enlightened community on the globe. In
every country where usury laws have existed, it has been
found necessary, for the aid of commerce, to relax their rigidi-

ty. Under a strict construction, bills of exchange, as well as valid notes, might be excluded; but we find the sale of the first universally admitted, and it is comparatively but in few instances that the sale or discount of the latter is objected to. Another remark of the judge is, that the law is important to restrain the power of amassing wealth without industry, and to prevent those who possess money from sitting idle and fattening on the toils of others. The judge appears to take it for granted, that every man in the possession of money or capital is an idle man. But is this the fact? No so; for it is only the industrious that are able in this country to amass wealth, and not those who fatten on the toils of others; for, in every community, (unless I am bound to except North Carolina,) they are the individuals who give energy to trade, commerce, manufactures, and enterprise of every description. He does not consider, that without the use of money, but little, if any, can be amassed, and that it is only where the money is to be had that wealth increases; that money, like every article, will seek the best market, and will not stay in North Carolina at *six* per cent, if it can obtain *seven* in New-York. The principles advocated in this case, would be just as applicable against loans at any rate of interest; for whatever may be the rate, the same objection of sitting idle may be brought against the lender. Most governments have deemed it beneficial to invite capital from all quarters; but, from the tenor of this opinion, I should draw the conclusion that it was rather deemed an evil than a good.

It will now be perceived, that after the very laborious researches of the counsel for the plaintiff, they have only been able to furnish a single case in any way analogous to the one before this court, and that a very doubtful one; and not one solitary case has been adduced from the records of the English tribunals, where the facts of the case or the principle of the decision was the same as that of Hendricks and Cram; that is, where the note was perfectly fair and given for a valuable consideration, sold or discounted by the payee, and where the suit was brought by the purchaser against the payee. That some opinions may be found favoring the doctrine contended for by the plaintiff in error, I think

not improbable ; but, in my view, this court is not to be guided in their adjudications by the mere *dicta* of the judges of other courts, but by the facts and principles of the cases relied on as precedents.

One general principle appears to govern almost all the cases examined, whether decided by the courts of these states or of England, which is, that a note given for a valuable consideration, and free from usury in its origin, cannot be tainted by any subsequent transaction ; but a note originally made for the purpose of raising money, and which is sold or discounted for more than the legal rate of interest, is void.    The difference between a note made for the sole purpose of raising money, and one given for a valuable consideration, is very obvious. The first in its inception is intended as security for a loan, and represents credit only, not property ; while the other is given for goods or other valuable consideration, and is the representative of money or property as truly as the note of a bank is such representative ; and it might as well be called usury to sell a bank note for less than its face, as to call it usury to sell on the same terms a note representing property.    In such a case we might exclaim with Kenyon, in *Parr* v. *Eliason*, if this suit can be maintained, no man would be safe in taking a United States Bank post note payable to order.

The principle which the counsel of the plaintiff in error attempted to enforce, that whenever a person receives money and is bound for its repayment, the transaction must be deemed a loan, is, in my view incorrect.    The purchase of bills of exchange and drafts, is a mercantile operation of daily occurrence and to vast amounts.    These purchases are always made of the drawer of the bill or draft, and they are nearly in every instance purchased for a greater amount than their face. If the bill is on a foreign house and comes back protested, the drawer who has received the purchase money is not only liable for the amount of the bill with interest, but ten per cent. upon every hundred dollars in addition.    If money is wanted in the city of New-York, Boston, or any of our commercial cities, a draft is purchased, either of one of the banks, or of an individual having funds or money in the place where it is wanted, and the price in all cases is regulated by the

scarcity or abundance of money, the responsibility of the drawers, and the expense and risk of transportation. In case of the protest or inland bills, five dollars is allowed, if on certain places, and three dollars on the hundred for others, with interest from the time of notice of protest and demand of payment. In either of these cases, if the bill or draft is not paid by the house upon which it is drawn, shall those who drew it be permitted to plead the statute of usury, because they received the money for the paper and are bound for its payment? In accordance with the principle contended for by the counsel for the plaintiff, every transaction in the purchase and sale of bills of exchange, or drafts, is usurious. This, I should presume, will not be admitted by any who are sensible of the importance of the commercial transactions of this state, and the facilities required to aid and encourage them. The true test is that established by our own courts; 1. That the bill or note must be given for a legal and valid consideration, and free from the taint of usury in its original formation; 2. It must be an available instrument in the hands of the original holder, so as to give him a right of action against the parties to it; and 3. Usury, to invalidate the note or bill, must exist between the original parties to it. The note of Gomez was a perfectly available instrument in the hands of Cram, and could not be negotiated without his becoming a party to it by his endorsement; and why should not the plaintiff in error be bound by his endorsement? The endorsement was necessary to effect a legal transfer of the note, and in making it, the endorser intended it as a warranty, that it should be paid by the drawer, or that he would return the money he received for it, with interest. If he did not so intend, why not indicate it by his endorsement, instead of endorsing it in blank? It was not made a condition of sale that the plaintiff should endorse in the manner he did. Instead of making conditions or reservations, he sent the note out with his own name on it; and under such circumstances, it would be far from just if he should be released from its payment. To permit the plaintiff, after having received the money, and perhaps gained from its use twice or three times the amount of discount, now to allege usury, would almost amount to an

encouragement of fraud and a violation of the statute. The object of the statute is to shield and protect the oppressed, not such persons as the plaintiff, who, having been benefitted by a contract, now endeavors to evade its fiulfilment.

There was no pretence, if I understood the counsel for the plaintiff correctly, to avoid the notes as against the maker, but that the claim of Hendricks against the endorser was void. I am unable to perceive how this is to be effected in accordance with the provisions of the statute; for if the transaction was usurious, then the statute pronounces the notes to be utterly void; and this is the principle which has governed in several of the cases cited by the counsel for the plaintiff in this court; but how the endorser can be separated from the drawer, when without the endorsement the notes were not negotiable, it is difficult to perceive, especially under the circumstances which attended the act of endorsing. The endorsement was as necessary in the consummation of the transaction as the making of the note, and the act of endorsing is made necessary by statutory provision, in order to a legal transfer of the instrument. Both the drawer and endorser, therefore, under the facts in the case, must be liable for the payment of the notes to the holder, or neither is liable for the payment of the notes to the of the notes had intended to exonerate himself from liability, he would have endorsed without recourse to him; but as he did not so endorse, and sent them into the market free of all conditions, they contained his warranty, and he must be liable for the payment of the amount he received, with interest.

In the purchase of a negotiable security of any kind, the price given must depend on the responsibility of the parties to the instrument. If the seller is not willing to become responsible, he will not add his warranty; and if he does add it, he knows or ought to know that the law as settled in this state makes him liable for the money he receives for the security, with interest. The drawer or acceptor, in the event of the demand being made of him, has no right to complain by being compelled to pay the amount expressed, as his engagement was that he would pay it for value received; and where then is the hardship of the case? There is none.

The counsel for the plaintiff in error endeavoured to enforce the necessity of a strict construction of the statute, in order that an effectual bar may be placed in the way of transactions such as those under consideration. These are transactions, however, in which the commercial part of the community are deeply interested. The merchant and trader often require facilities, unknown and unrequired by those whose pursuits run in a different channel. The changes and fluctuations in the money market are notorious and frequent, and when this necessary article can be had in no other way, it must be obtained by a sale of property, at whatever price it will bring, whether such property be merchantable or negotiable securities. A party will dispose of one or the other, as his interest may be affected by the transaction. If the market is bad for the goods he may have on hand, and the prospect of a better market is in view for the future, he will not sacrifice his property under the hammer of the auctioneer, when for a moderate premium on his negotiable securities he can raise the sum he wants. There is certainly nothing in this which partakes of usury, or of an intention to evade the provisions of the statute. A knowledge of the necessity of these facilities in mercantile transactions has induced, I have no doubt, the English as well as our own courts to give a liberal construction to the statutes on usury, and by confining their operation within prescribed limits, have not only prevented the embarrassment, but in many instances the utter ruin of thousands who were extensively engaged in foreign commerce.

Another objection urged was, that inducements were held out to the trading part of the community, by the facility afforded for raising money by the sale of securities, to enter into ruinous speculations, injurious to themselves, as well as those with whom they deal. We might as well attempt to reason from the fact, that because evils have resulted to some from the free and uncontrolled right a man has over his own property, that the exercise of this right ought to restricted ; but if we are to abrogate all laws that may be construed as holding out inducements to the improvident and unthinking part of the community to act unwisely, there would be many less in the statute book than there now are. To attempt, therefore, to

ALBANY,
Dec .1831.

Cram
v.
Hendricks,

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

frame laws with a view of preventing improvidence, thought-lessness and negligence in trade, would be a hopeless task, and one that cannot be effected while the imperfections of our nature remain. But where is the proof, except in the imagination of the counsel, that the principle upon which our courts proceed will prove deleterious? The experience of the past proves the utter inconsistency of the theory advanced; for the principle having been established and acted on in every case which has come up for adjudication in our courts from 1811 to the pesent time, and no instance of evil having been shewn or referred to by the able counsel for the plaintiff in error, it is evident the suggestion is without foundation. If we advert to facts, and compare the condition of the people of this state in 1811 with what it now is, we cannot but perceive that instead of the fancied oppression of the money lender, money has been annually increasing among us, and has been obtained in this state at a less rate of interest than in many of *the other* states of the union. In proportion as the shackles of the law are loosened, and men are permitted to purchase and sell, upon terms of reciprocity, capital increases, and the price for its use lessens. That there is a great increase of capital in this state since 1811, principally foreign, cannot be doubted. Whether the investment which it seeks is the purchase of notes and bills, or the stocks of our monied or manufacturing establishments, this fact is incontrovertible, that we have prospered as a state in our agriculture, commerce and manufactures, although our citizens have been permitted, under the construction given to the statute, to purchase and sell negotiable securities, without subjecting themselves to the pains and penalties of usury.

It has been held, if a contract is susceptible of two construcions, one of which will bring it within, and the other without the statute of usury, the latter construction should be adopted. 3 Cowen, 284. But the question whether a contract is in substance a loan, disguised in a shape to evade the law, or a *bona fide* transaction of another species, belongs to the decision of the jury; and in *Chesterfield* v. *Jansing*, the master of the rolls observed, that whether an agreement was usurious or not, might be determined in two ways: first, by the verdict of a

jury on the plea of the corrupt agreement, and second, by the court exercising their own judgment on the particular circumstances of the case. 3 Com. Law R. 98. The cause under consideration was submitted to a jury; they heard all the evidence, were possessed of all the facts and circumstances of the case, and therefore were competent to decide whether the transaction was one coming within the provisions of the act for preventing usury, or not; they decided that the transaction was not usurious, and gave a verdict for the plaintiff for the amount actually advanced by him on the notes, with legal interest from the date of such advance to the date of the verdict. The supreme court have sustained the verdict, and if there is still any doubt as to the proper construction of the transaction, whether it be a loan or a sale, it ought to be decided by this court, upon the principle laid down in *Archbold* v. *Thomas*, by adopting that construction which will bring it *without* the statute. The fourth section of the " act for preventing usury," although intended to regulate the proceedings relative to usury in the court of chancery, I think may be referred to as sustaining the verdict of the jury in the court below, and in some measure shewing the spirit under which the law was enacted. The substance of the section, is, that persons charged with taking usurious interest, may be compelled to answer under oath in the court of chancery, and discover the amount thus taken; and upon making such discovery and return of the money taken more than interest, with the costs of suit, they shall stand acquitted from any forfeiture or penalty. The verdict of the jury is to the same effect; for the plaintiff in the court below recovers no more than he paid, and therefore virtually returns all he has retained over and above lawful interest. If, then, the legislature have deemed it necessary to restrict the court of chancery in their judgments to damages to the defendant of the excess of interest received, why should not the same rule operate in the action of *assumpsit*, which is an equitable action? Whether this construction of that part of the statute be correct or not, is of little importance in the present case, as the transaction between the parties in this case was evidently of a nature not contemplated by the legislature when the act was passed. A

conclusive proof of this is, that at the revision of the statutes in 1828, the law, as settled by the supreme court, had existed and been acted on for a period of 16 or 17 years; and although the legislature did amend the statute, so as to protect the inno- cent holders of notes contaminated with usury, they neither abridged or altered the law in any other respect.

A very important consideration in deciding upon this ques- tion is, the impropriety of overturning the law as it has exist- ed and been generally understood for so many years, and un- der which not only the contract in question, but numerous oth- ers have been entered into. These contracts, we have a right to presume, have been consummated in good faith, and with a knowledge that they were sanctioned by the decisions of the supreme court; and it would seem to be injustice now to declare all such contracts void, and thus deprive the parties of a property legally acquired. If the law is wrong, it appears to me the proper forum for its amendment is the legislature, and not this court. If the legislature shall deem it proper to amend the law, it will operate as it ought upon all subsequent contracts, while the decision of this court would have an *ex post facto* operation, and reach cases which have been con- summated under the sanction of well considered legal adjudi- cations.

I am of opinion, therefore, that the judgment of the supreme court should in all things be affirmed.

By Mr. Senator BEARDSLEY. The question involved in this controversy is one of vital importance to commercial men, and should be dispassionately considered and settled by this court. If the transaction is usurious, we ought fearlessly to pronounce it such; but if there is a reasonable doubt whether it is usuri- ous within the meaning of the statute, I hold it to be the duty of this court to sustain the judgment of the supreme court. We do not sit here to make law, but to pronounce what the law is; and if there is a defect in the usury law, it belongs to the legis- lature, and not to the courts, to correct it. When the legislature makes a new law or amends an old one, the enactment applies only to cases arising after the law is made or amended; but when courts apply the law to new cases, their decisions relate

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

back to past cases. In this view of the subject, it is more discreet for the legislature to provide for defects in the law by a new enactment, than for courts to extend the law by strained constructions to doubtful cases.

It will be conceded that the rule adopted by the supreme court is perfectly just and equitable between the parties, and is that which court of equity always adopt where a party comes into chancery to be relieved from a usurious contract. They require the party to do equity when he asks equity, and before granting relief, compel him to pay the amount actually received, with interest. I do not refer to this rule with a view of contending that in cases of usury, courts of law ought to adopt it, but merely to show, that being equitable, the party who is brought to this standard has no reason to complain where usury is not clearly established.

The law in relation to usury on this point, has for many years been considered as well settled by the decisions of our courts, and I know of no case in this state that militates against the doctrine of the supreme court. The rule is this, that where a note is valid in its inception, it may be sold at a discount beyond the legal rate of interest, and without subjecting the purchaser to the imputation of usury. If he sues the maker, he may recover the full amount; but if he sues his immediate endorser, he shall recover of him only the amount paid, with interest. On the other hand, if a note is usurious in its concoction, the stain of usury accompanies it and renders it void in the hands of a *bona fide* purchaser. *Lowe* v. *Walter*, Doug. 736, 740, &c. So rigid is this latter feature, and so contrary to the common standard of morality, that jurors have struggled with the courts and frequently have sturdily resisted in favor of *bona fide* holders. Several cases referred to on the argument were of this description. 2 Bay, 23. 2 Johns. Cas. 60. id. 66, 206. These show that the sense of the community is against extending the provisions of the usury law beyond its legitimate object; and where a transaction is susceptible of two constructions, one in favor of, and the other against usury, that construction shall be adopted which will give effect to the contract and avoid the usury. 3 Cowen, 284, 5. The modification of our usury law in the revised statutes, 1 R. S. 72, in

favor of *bona fide* holders of usurious · instruments, also shows the sense of the community against the rigid features of the former law, and indicates that if the case under consideration has not been considered usurious, we are not called upon by public sentiment to extend the doctrine of usury to new cases, but rather to restrict it.

Our statute of usury, 1 R. L. 1813, p. 64, declares " that no person or persons whomsoever shall hereafter take, directly or indirectly, for loan of any monies, &c. above the value of 7 per cent. per annum ; nor take any bond, bill, note or security whatsoever, for payment of money *to be lent,* or to be due or payable by any means whatsoever, whereupon or whereby more than 7 per cent. shall be reserved." " And further, that all bonds, bills, notes, contracts, and assurances whatsoever, and all deposits of goods, or other things whatsoever, for payment of any principal or money *to be lent* or covenanted, or agreed to be paid, above 7 per cent. shall be void." To constitute usury, there must be 1. a loan ; 2. taking more than lawful interest : 3. a corrupt agreement. *Bank of Utica* v. *Wager,* 2 Cowen, 712. 4 Peter's U. S. R. 205. Ord on Usury, 23, &c. Now to constitute usury, courts have uniformly considered it necessary that there should be a *loan* of money either express or implied, and where more than the legal rate of interest has been reserved, and it was a *loan,* they have adjudged it usurious and void ; but if the transaction was a sale of an available security, then it was not so. *Floyer* v. *Edwards,* Cowp. 114. *Lowe* v. *Waller,* Doug. 740. 19 Johns. R. 508. Hence in every case the question is, *what is the real substance of the transaction ?* not what is its color and form ; was it a loan and the intent of the parties to cover usury, or was it an ab_ solute *bona fide* sale? Thus in *Massa* v. *Dauling,* Strange, 1243, which was an action against the *endorser* of a promissory note of £200, which the plaintiff had discounted at £197, having 3 months to run, and then took another note for the same amount having 3 months more to run on a further discount of £3, Chief Justice Lee *left it to the jury* to say whether it was a *loan* or a *purchase* of the note, and upon their pronouncing it a loan, it was adjudged usurious. This was a question like the one now before this court, between the endorsee and en-

dorser, and was long before the revolution, and of course constitutionally binding on the courts in this state.   The principle decided ought to control the decision of the present cause, and in my opinion is decidedly opposed to the new doctrines which have recently been stated and are now urged in favor of reversing the judgment of the supreme court.   If the bare fact of selling a valid note at a discount, constitutes usury, as between the purchaser and the seller who endorses it, as is contended by the counsel of Cram, then why, as in the case in Strange, should the question be submitted to a jury, to say whether it was a sale or a loan ?   If the doctrine contended for by Cram's counsel be correct, then Chief Justice Lee, in *Massa* v. *Dauling*, ought to have told the jury, that as between the endorsee and endorser, the bare fact of selling the note at a discount constituted usury, and that they were bound to find against the plaintiff.

The books uniformly recognize the distinction between a *sale of securities* and a *loan of money* under the colour of a sale ; and this distinction is recognized and spoken of in cases between endorser and purchaser. If, as is now contended, a sale must in all cases be considered in the nature of a loan, *where the seller becomes responsible*, then I can see no sense in judges recognizing that distinction, where the question is between the purchaser and endorser.   It will, however, be found that this distinction is not confined to cases where the seller merely parts with his interest without responsibility, but is recognized in many cases between endorser and purchaser, which I shall have occasion to refer to, as it was in the case already cited from Strange.

Then can the purchase of the notes in question be considered a loan? for if the bargain was a sale and purchase, it is not within the statute.   The notes were vendible property made transferable by statute, and recoverable in the name of the endorsee.   They were sent into the market to be sold for cash to the highest bidder, and were valid in their inception There is nothing in the case from which the slightest inference can be drawn that the parties *intended it as a loan*, or that the idea of a loan ever entered into the mind of either of them ; the whole transaction shews the reverse.   Cram had sold his

rum on a credit of four months without interest, nd it is a fair inference, that in consequence of this credit, he sold at an advance equal to the discount on the note. Every business man knows, that in our commercial cities the credit of merchants is frequently sustained by a sale of notes, as in the present instance. When money is scarce, they raise it more readily and on better terms, by selling their goods on a credit, and endorsing and sending their customers' notes into market, than to dispose of their goods for cash at the auction rooms. How, then, does the present transaction partake of the character of a loan? It is said by the counsel of the plaintiff in error, that every advance of money for a promissory note, to a person who is, or may become liable to repay it, is in effect a loan. It is true, *every* loan implies an advance of money or money's worth; but it is not true that every advance of money is a loan, nor that the eventual liability of the receiver to refund is the true characteristic of a loan; and why should the sale of a note be placed on a different footing from the sale of any other article of property? Suppose a man buys a bill of exchange at a discount, is that a usurious loan merely, because of the contingent liability of the endorser, if the acceptor should not pay? or suppose a man purchases a farm, and takes a deed with covenants, and is afterwards evicted, the grantor is liable to refund the purchase money, with interest; but this is not on the principle of a loan. So in the purchase of a chattel, if the title fail, the vendor must return the money, but not on the principle that the money paid was a loan or in the nature of a loan.

The endorsement of negotiable paper, when offered for sale is to transfer the right of action upon it by virtue of the statute and is in the nature of a warranty that the paper is valid, and will be paid when due. If the paper is valid, and the money is, not paid, the endorser, if duly notified, is liable by his contract to pay; but it does not follow that the sale is a loan in consequence of the endorsement, nor can the maker, if the note was valid, set up usury against the holder who purchased it at a discount in market. 15 Johns. R. 44. 2 Bay, 23. 3 Pickering, 184. 2 McCord, 173. 3 id. 365. 4 id. 402. Judge Spencer, in giving the opinion of the supreme court, in *Munn* v. *The Commis-*

*sion Co.* thus expresses himself: " This appears to be the true test in distinguishing between a case where the discount of a bill, at a higher premium than the legal rate of interest, will render the transaction legal, by considering it a purchase of a bill already perfect and available to the party holding it; and where it will be illegal as a usurious loan of money. The principle is too well settled to be questioned that a bill free from usury in its concoction may be sold at a discount, by allowing the purchaser to pay less than the amount." In *Powel* v. *Waters*, 8 Cowen, 669, Chancellor Jones, in the court of errors, at page 685 and 6 says : " The distinction between the purchasing a note and a loan upon it, by way of discount, is well settled. A note that has been negotiated by the maker, and might, at maturity, be enforced against him by the holder, may be sold at a greater discount than 7 per cent. without involving the purchaser in the penalties of usury, but the note must be perfect and available to the holder, to make it saleable by him—*the test is the right to maintain an action upon it, if it were then due.* In the case of *Munn* v. *The Commission Company,* this test was applied to distinguish between a purchase of negotiable paper under value, and an usurious loan on the credit of it. And the question was held to be, whether the holder could maintain an action. If he could, a sale at a discount was defensible as a purchaser ; if not, it was illegal as a usurious loan." In the same cause, *Senators* SPENCER and COLDEN, in very marked language, adopt the same principle as correct, and this without disapprobation by the other members of the court ; so that it may almost be considered an adjudication by this court.

The leading case in the English courts, relied upon by the counsel of Cram, is *Lowes* v. *Mazzaredo,* decided by Lord Ellenborough, in 1816. 1 Starkie, 385. It was an action on a bill of exchange against the defendant, as acceptor, drawn by G. Lowes on the defendant, payable to the order of the drawer, and was endorsed by Lowes, the drawer, and negotiated by him to one Bloxham, at a discount of 5 per cent. beyond legal interest. By a subsequent endorsement and sale, it was purchased by the plaintiffs upon a fur-

ther discount beyond legal interest, and on their prosecuting the acceptor, it was held, on the authority of *Lowe* v. *Waller*, Doug. 736, that they could not recover. In regard to this case, the inference is irresistible, that it was an *accommodation bill*, made expressly for the purpose of raising money, and without consideration. I infer this from the fact that the drawer made it payable to his own order, and negotiated it himself at a discount, after endorsing it; and it is so considered by Judge Johnson, in *Johnson* v. *King & Jones*, 3 M'Cord's R. 370. This case, then, if it was an accommodation bill, merely decided that a bill made for the purpose of raising money, if sold at a discount beyond legal interest, was usurious. This was in exact accordance with all the cases in England and in our own courts, and proceeds on the ground that a note or bill made for the purpose of raising money, has no legal existence till negotiated; before then, it is the same as waste paper, and if sold at a usurious discount, the usury enters into its composition, and taints it in the hands of a *bona fide* holder. 15 Johns. R. 44. 3 Pickering, 187. Lord Ellenborough was of opinion that the plaintiffs could not recover on the bill, since they were obliged to claim through an endorsement which had been vitiated by usury. The case of *Parr* v. *Eliason*, East, 92, was relied upon by the plaintiffs, but the court were of opinion that *Parr* v. *Eliason* was distinguishable from this, and that in the present case the endorsement was entirely avoided by the statute of usury, and could not be dismissed for one purpose and retained for another, and that after the case of *Lowe* v. *Waller* had been acted upon so long, its foundation could not now be inquired into. *Lowe* v. *Waller* was a case of usury in the first instance, and the court merely decided that the note being void in its inception, no subsequent act could cure it, and that it was void in the hands of an innocent holder. If Lord Ellenborough intended to decide that the endorsement of a *bona fide* note might be avoided on the ground of *usury in the endorsement*; in the hands of a *bona fide* holder, then the case in *Douglass* does not sustain his opinion, for that was the case of a usurious note; but if his lordship considered the bill as one drawn to be sold in market merely to raise money, and was not only sold at a discount,

but in a subsequent sale purchased by the then plaintiffs at a further discount beyond legal interest, thus heaping usury upon usury, his observations may be reconciled with other decisions. It is probable, however, that his lordship intended the remark as applicable to all sales to negotiable securities, because, as counsel, he had sixteen years before contended for the doctrine, that where a valid instrument was endorsed on a usurious sale, the endorsement being void on the ground of usury, the seller who had endorsed might recover the bill in an action of *trover*, even against a *bona fide* holder. Such was the case of *Parr* v. *Eliason*, 1 East, 92, in which Lord Ellenborough was counsel for the plaintiff, and was decided in 1800 by Lord Kenyon against the plaintiff. I shall have occasion to notice this case more particularly hereafter, and for the present will merely remark that it was considered sound law till Lord Ellenborough overturned it, sixteen years afterwards, on his coming to the bench.

The next English case relied upon by the counsel of Cram is *Chapman* v. *Black*, 2 Barn. & Ald. 589, decided in 1819, where a bill affected with usury, being in the hands of an innocent holder, he, on being informed of it, took a fresh bill drawn by one of the parties to the original usury, and accepted by a third person for the accommodation of the other; and on the authority of *Lowes* v. *Mazzaredo,* it was held that he could not recover against the acceptor. It appears from the case, that the first bill was made expressly to be discounted, and of course usurious if discounted beyond legal interest. The court say that the plaintiff knew the first bill was usurious when he took the second, and ought to have resorted to the person from whom he received it; otherwise the usurer would retain the money, and the statute be violated with impunity.

The case of *Gaither* v. *The Farmers' and Mechanics' bank of Georgetown*, 1 Peters' U. S. Rep. 43, was relied upon as a leading American case against the opinion of the supreme court. The bank had made a usurious loan to Corcoran, the owner and payee of Gaither's note; Corcoran endorsed Gaither's note, and pledged it to the bank as security for the usurious loan. Corcoran failed to pay, and the bank sued Gai-

ther, who set up usury in the loan and pledge, as a defence to the action. Corcoran then paid the bank, and agreed to have the suit proceed in the name of the bank, but for his benefit. On the authority of *Harrison* v. *Hannel*, 5 Taunton, 780, the court decided that the bank could not recover, because the pledge was to secure a usurious loan. It was *not a sale* of the note, but a *mere pledge* to secure the loan. The contract for the loan being void for usury, no interest could be acquired by the bank in the note pledged. To make that an authority in the present case, it should be shown that the present was a usurious loan, instead of a sale; thus begging the whole ground. In *Harrison* v. *Hannel*, above referred to, an acceptance was given to cover several debts, part valid and part known to be usurious; and being blended, the court very properly held the whole tainted with usury.

*Ruffin* v. *Armstrong*, 2 Hawk's R. 411, a case decided in North Carolina, was also relied on as an authority directly in point against the decision of our supreme court. That was an action by the *purchaser* of a sealed note against the *payee* of the note, who had endorsed it. The note was given to Armstrong for $911,28, with interest, and was endorsed by him, and put into the hands of his clerk to be negotiated for cash, with directions to conceal from the purchaser the fact that the note belonged to Armstrong. The clerk represented to Ruffin, the purchaser, that he owned the note and sold it for $600, after endorsing it, without recourse to himself as endorser. It did not appear whether the note was made for the purpose of raising money, but the court assumed the fact that although the clerk was an actor in procuring the money, yet in fact it was to be regarded as a sale by Armstrong; and as he had endorsed the note, and thereby made himself liable, it was to be regarded as a loan, and usurious. If the court were correct in adjudging it a loan, then the decision that it was usurious may be sustained, and a purchase at a discount of more than $300 showed it oppressively so. It is apparent from the case, that the judges considered the endorsement of Armstrong as constituting a new security for the purpose of raising money, and they apply the doctrine of our supreme court in

*Munn* v. *Commission Company*, 15 Johns. R. 44, that a note made to raise money, and sold at a discount is usurious.

*Whitworth* v. *Adams*, 5 Randolph, 333, was also cited by the counsel of Cram. In this case the judges *seriatim* and at great length enter into a general discussion of the law of usury, and many speculations on points not precisely under consideration, are introduced and discussed. It was an action by the *endorsee* of a promissory note against the *maker*. The note was made for the *express purpose of raising money*, was endorsed by the payee, for whose benefit it was made and delivered to a broker to negotiate, who sold it at the instance of the owner, the payee and endorser, at a discount of 3 per cent. a month. It came to the plaintiff subsequently, and he was considered by the court as an innocent holder, and was allowed to recover, three judges being in favor of the recovery, and two against it. On this state of facts, the note would have been adjudged usurious in this state and in England. The judges, however, also decide " that an immediate endorsement of a valid note for an usurious consideration, as between endorser and endorsee, will not vitiate the note in the hands of a subsequent *bona fide* holder, without notice of such usury." A majority of them also decide, " that where a note valid in its inception, is afterwards endorsed by a party to whom it has regularly come, to a third person, at a greater discount than legal interest, such transaction is usurious." By examining the case, it will be found that the judges did not all agree in the leading propositions; and Judge Coalter, at page 388, approves of the decisions of our supreme court, that the endorsement of a note by the payee, at a discount greater than legal interest, does not, *per se*, render it usurious, although his honor gives a different reason for his opinion from what was given by our court. I shall leave this case without attempting to reconcile its conflicting doctrines with the decisions of our courts, with simply remarking that part of the propositions are in accordance with the doctrines contended for by the counsel of Cram, and part against them.

*Knight* v. *Putnam*, 3 Pick. 184, also cited, was a case by the *endorsee* of a note against the *maker*, and the defence was that the payee, the endorser, had sold it at a usurious discount, and

that the maker could set up the defence against the purchaser. The court decided that the maker could not object to usury in the transfer. This is contrary to the decision in *Lloyd* v. *Keach*, in Connecticut, which will be noticed hereafter. Judge Wilde, who gave the opinion of the court in *Knight* v. *Putnam*, remarked, that had the suit been against the endorser, he might have availed himself of the usury. This remark was extrajudicial, the point not being before the court; but it is supposed to have been sanctioned by a remark of Chief Justice Parsons, in 4 Mass. R. 162. *Herman* v. *Sprigg*, 3 Martyn's R. 191, was also cited, where the same doctrine appears to have been intimated, although the case under consideration was an *accommodation note*, and the point not necessarily raised.

*Lloyd* v. *Keach*, 2 Conn. R. 175, was cited; but on the question whether the sale and endorsement of a note at a discount beyond legal interest in all cases usurious, is an authority rather against the plaintiff in error in this cause than for him. The court decided, 5 judges to 4, that the sale of a note endorsed by the seller at a discount exceeding legal interest is *not* in all cases usurious, but is *prima facie* valid; and that it is incumbent on the party alleging usury, to show the circumstances which bring it within the statute; thus as in the case of *Massa* v. *Dauling*, Strange, 1243, making it a question of fact as to the intent of the parties. A majority of the judges, however, contrary to the decision of *Knight* v. *Putnam*, 3 Pick. 184, came to the conclusion that if there had been usury in the sale, the maker might set it up as a defence.

These are the leading cases relied on by the counsel of Cram, although many others were cited which appear to me to have no bearing on the present question. The English cases are long subsequent to our revolution, and not constitutionally binding on our courts; and the decisions in our *sister states*, predicated upon the decisions in Westminster Hall, although entitled to respectful consideration, are not binding as authorities. It has long been decided, that where an instrument is valid in its inception, usury by way of forbearance money in its subsequent stages will not avoid it. *Ferall* v. *Shaen*, 1 Saund. 295. This decision is more than 150 years old, and is supported by a great variety of cases, and yet one

of the counsel of Cram was rather inclined to question its correctness.

I will now refer to some authorities which are supposed to warrant the supreme court in their decision in this cause ; and first, *Parr* v. *Eliason*, 3 Esp. R. 210, 1 East, 92. This was an action of *trover* by Parr to recover a bill of exchange from the defendants as holders, on the ground of usury in his sale and endorsement, which being void, as he contended for usury, no interest passed by the sale of the bill. The cause was decided in 1800, and was the one in which Lord Ellenborough was counsel for the plaintiff. The remarks of Lord Kenyon, who decided against the plaintiff, are so appropriate that I subjoin them : " There is nothing in this point, and it might be attended with serious consequences if it could be supposed that the court entertained any doubt upon it. The commerce of this country subsists upon paper credit, but if this action could be maintained, no man would be safe in taking even a Bank of England post bill payable to order ; for however just and legal it might be in its inception, if the payee passed it to another for a usurious consideration, it is now contended that it would be void in the hands of any subsequent innocent holder, and might be recovered from him." " Again, where the bill itself, in its original formation, is given for a usurious consideration, the statute declares it void, and the construction which has been put upon the statute has gone far enough in saying that it shall be avoided in the hands of a *bona fide* holder without notice ; but no case has gone the length now contended for, nor do the words of the statute require it." ' '

*Wiffen* v. *Roberts*, 1 Esp. R. 261, was an action against the drawer of a bill for £86, on which the plaintiff had advanced but £29. It was held, that as it was an *accommodation bill*, he should recover only £29, he knowing it to have been such a bill ; but on a note or bill given in the fair course of trade, he should recover the whole amount. On the authority of this case, the supreme court decided in *Braman* v. *Hess*, 13 Johns. R. 52, that where a valid note was sold at a discount, the endorsee or purchaser could not recover from his immediate endorser any more than he had paid for the note. The same principle had been previously intimated in *Brown* v. *Mott*, 7 R. 361, on the au-

thority of *Wiffin* v. *Roberts* and Chitty on Bills, 65. The case of *Braman* v. *Hess*, was this: one Williams gave the note in question to Yordan for a farm, who, with Hess, endorsed it and sold it to Braman, at a discount of $90. Hess was sued by Braman as endorser, and on the trial insisted that the $90 should be deducted, which was overruled by the judge at the circuit, and a verdict was taken for the full amount. The supreme court ordered a new trial, unless the $90 was deducted. The cause was submitted on written arguments, and it does not appear from the report of the case that the question of usury was raised; but, in point of fact, from having been concerned in the cause, *I knew the question of usury was raised.* In reporting the cause, probably no notice is taken of the usury question, because that was not raised at the circuit, and the objection was taken that it was too late to urge it at bar. In the case of *Munn* v. *The Commission Co.*, 15 Johns. R. 44, decided in the supreme court by the same judges, above two years after the decision of *Braman* v. *Hess*, they refer to the latter case as an authority, and it is conclusive that they so considered it.

The cases of *Munn* v. *The Commission Co.*, *Munn* v. *Herman Ruggles*, *Munn* v. *Oliver Ruggles*, 15 Johns. R. 57, were brought on a draft drawn by *Herman Ruggles* for his own benefit, on the agent of the commission company, for $4500, and accepted by him as their agent. *Oliver Ruggles* endorsed the draft, and it was subsequently discounted on a deduction of $137,25 by Munn. The draft was adjudged valid in its inception, but it was objected that Munn could not recover on the ground of *usury*. The court gave judgment in favor of Munn in the three suits, as follows: against Herman Ruggles, the drawer, for $4500 and interest; against the commission company, the acceptors, for $4500, with interest; and against Oliver Ruggles, the endorser, for the *sum actually received*, $4362,75, with interest. The same point was then under consideration that is now submitted to this court, and in those cases the question was considered, as well as it respected the *drawer acceptor* and *endorser*, and the principle applied to each. The court say, " where a bill or note is valid as between the drawer or maker and payee, so that the latter can maintain an action against

the former, it is valid in the hands of an endorsee who has discounted it at a higher rate of interest than the legal rate, and he may recover the full amount against the maker or acceptor; but the holder of a note, purchased at a discount greater than the legal rate, can only recover against the endorser the sum actually advanced." The authority of this case was admitted in the court of errors in 1826 in *Powell* v. *Waters*, 8 Cowen, 669, &c. by Chancellor JONES, and *Senators* COLDEN and SPENCER; and the counsel of Cram, on the argument of the present cause, admitted that so far as the assent of Chancellor Jones and the learned senators was to be considered an authority, it was in favor of the supreme court.

In *Rice* v. *Mather*, 3 Wendell, 62, the supreme court reiterate the same opinion as in the present cause, and in the present suit they have reviewed the question and authorities, and the very able and lucid opinion of Judge SUTHERLAND shows that the question was well examined and duly considered.

In Gould's edition of Espinasse's Nisi Prius, part 1 p. 74, it is said, " a man may *bona fide* purchase a note at a discount beyond legal interest, even at 25 or 30 per cent., and at the lowest rate he can, without incurring the penalty of usury," 1 Dall. 216. 2 id. 92. A *bona fide* sale of a note at a discount is not void on the ground of usury. *Foltz* v. *Urry*, 1 Bay, 486. *Payne* v. *Trezzant*, 2 id. 23.

In *Jones* v. *Davison*, 1 Holt, 256, A. employs B. to get a bill discounted, and agrees to give him a sum of money beyond legal interest. B. procures C. to discount it, who requires B. to endorse, but takes only legal interest. B. pays the avails to A., deducting the part he was to retain. In an action brought by the endorsee of C. against A. the drawer, held that he could not allege usury. In this case, Chief Justice Gibbs doubted the correctness of former decisions which adjudged usurious notes void in the hands of *bona fide* holders, and intimated a wish that the question might be reserved and brought before the court. In a note to this case, the following language is used: " A man may sell a bill at any price, if there be no shift or device. If he endorses it, it then becomes a question for the jury, whether it was not a

VOL. VII.                    79

shift for a loan. It cannot be too often repeated, that to constitute usury, there must be either a direct loan, and a taking of more than legal interest, or there must be some device for the purpose of concealing or evading the appearance of a loan, when in truth it was one."

In the case of *Lloyd* v. *Scott*, 4 Peter's U. S. R. 205, Judge McLean discusses the question of usury at large. The question was on the purchase of an annuity of $500 per annum for $5000, and alleged to be usurious. After defining usury, and stating its ingredients, and among them that a loan express or implied was indispensably necessary, he remarks : " If it were a *bona fide* purchase, there is an end of the question of usury."

In *South Carolina* the construction put by our supreme court upon the statute of usury appears to have been fully adopted. In *Fleming* v. *Mulligan*, 2 McCord's R. 173, which was an action by an *endorsee* against *endorser*, on a note made for the *accommodation* of the maker, and sold at a discount beyond legal interest, the court held it void, on the authority of 15 Johns. R. 44. But Justice Colcock, in giving the opinion of the court, says ; " Where a note made *bona fide* for a valuable consideration is brought into market, it may, like any other property, be sold for less than its value. It is then always a question of fact for the jury, whether the note is one of that character, or made to evade the statute." This was in reference to a question between endorsee and endorser, and the judge made no allusion to the principle maintained in some cases in other states, that an endorsement of a valid note· may be operative to pass the note, but usurious as against the endorser. In *Johnson* v. *King & Jones*, 3 McCord's R. 365, the same court establish these propositions : " It is not usurious to sell or buy a negotiable paper, founded on a legal consideration, for less than its nominal value. Where a note on a legal consideration is drawn to order and endorsed, no matter how often it has been polluted in the hands of intermediate holders, it is still valid in the hands of a *bona fide* holder." In arriving at his conclusions in this cause, Judge Johnson, who gave the opinion of the court, makes use of language so appropriate, that I subjoin two extracts. At page 368, he

says : " Courts of justice have universally labored to untrammel the restraints on the circulation of negotiable paper as indispensably necessary to the existence of commerce. They constitute indeed the mainspring, the very sinews of all commercial enterprize, and without them all its opperations would be greatly impeded, if not wholly obstructed." And at page 370, speaking of the decision of Lord Ellenborough in *Lowes* v. *Mazzaredo,* he says : " But I cannot reconcile such a doctrine with the well settled rule, that it is not usurious to sell or buy negotiable paper, founded on a legal consideration, for less than its nominal value; and that such is the rule, may be deduced from the universal practice and consent of mankind. Bonds, notes, bills of exchange, bank notes, certificates of stock, and even specie itself are the common subject of traffic, and their intrinsic value must always depend on such an infinite variety of circumstances that no forsight or wisdom can regulate it. It is, therefore, I think, wisely left to take care of itself, and I confess, that after the most diligent effort, I have been unable to detect in this case a single circumstance which distinguishes it from the ordinary case of selling a note for less than its nominal value. To declare that the parties to such traffic had incurred the pains of usury, would convulse the whole commercial would to its centre." This language shows the estimation in which that learned court held the doctrines of Lord Ellenborough, which have been urged with so much force upon the consideration of this court. In one case more from South Carolina, *Harick* v. *Jones,* 4 McCord's R. 402, decided in 1827, the court reiterate their former doctrine, that " notes originally founded on a good consideration, though afterwards sold for less than they are nominally worth, do not make a case of usury." At page 405, in speaking of the rule laid down to the jury, the judge, in giving the opinion of the court on a motion for a new trial, says : " I am not disposed to call in question the correctness of this rule, so far as it applies to notes originally founded on a legal consideration and sent into circulation; for nineteen twentieths of the commerce of the world is carried on through the agency of these and like securities, and when once they are legally in market, they become the fair subject of traffic. The commercial value of ne-

gotiable paper, when in the market, is determined sometimes by the probable solvency of the drawers and endorsers; sometimes by their character for punctuality; the time and place of payment also have their influence; sometimes they are sold at a discount, and often command a premium.

A review of these authorities, with many others referred to on the argument, have resulted in a perfect conviction to my mind that we ought to adhere to the decision of the supreme court. We ought to sustain it, because I do not believe the legislature ever intended to prevent the *sale* of a valid endorsed note, at a discount beyond legal interest, when the sale was not a device to cover usury. We ought to sustain it, because, from an acquiescence in it for many years, it has been considered the settled law of the land, and our citizens have made contracts on the strength and credit of it. It should not, therefore, give place to any strained construction of the statute of usury, or plausible judicial theories in speculating on that statute. If the question was now for the first time agitated, and altogether untrammelled by decisions, I think the opinion of the supreme court might be sustained on principle; and were it now a question of legislative expediency, I do not believe a contrary enactment would be wise or salutary. If it were conceded that the court of *king's bench* considered the decision in *Lowes* v. *Mazzaredo* as sound law, we ought to look at the consequences and weigh the reasons for that decision, before we servilely respond to the decisions of Westminster Hall. If the opinions of sound and learned men have an influence in our decisions, I know of no tribunal on this or the other side of the water, whose adjudications more pre-eminently commend themselves to our respectful consideration than those of our supreme court, under such men as Chief Justice *Thompson*, Chief Justice *Spencer*, Judges *Van Ness*, *Platt* and *Yates*; and when I find their deliberate opinion upon a great principle approved of by their successors, our present judges, and sanctioned by Chancellor *Jones* and *two learned Senators* in this court, and sustained by repeated decisions in the enlightened *Courts of South Carolina*, I cannot bring myself to believe that they have mistaken the law. Thus, while respectful attention should be given to the decisions of

the English courts, so far as they appear to be founded in rea-

son, good sense, and expediency, an undue veneration should
not be awarded to them merely because they emanated from
Westminster Hall.   Those familiar with the great variety of
cases which have grown out of the decision in *Walton* v. *Shelly*,
in the court of king's bench, " that an endorser should not
be allowed as a witness to impeach a note endorsed by him-
self," can have no wish to see our courts again adopting an
absurd decision, and afterwards, with the English courts, re-
sorting to various subtle distinctions to fritter away its effect,
and in the end, boxing the judicial compass to come back to
the starting point.

On the argument of this cause, one of the counsel for the
plaintiff in error expressed a strong conviction that a valid
note, endorsed at a discount beyond legal interest, could not be
recovered, even by a *bona fide* holder, against the maker.   This
appears to be the opinion of Lord Ellenborough in *Lowes* v.
*Mazzaredo*, because, as he said, the endorsement could not be
dismissed for one purpose and retained for another ; and it is
so understood by some of the judges in our sister states, where
that decision has been recognized as sound law.   This ap-
pears to me to be correct, if it can be established that an en-
dorsement of a valid note at such a discount is usurious—it
follows as a necessary consequence from the other doctrine ;
because, if every endorsement is to be regarded as a bill of ex-
change, and constituting a *new contract*, then the endorsement,
being usurious, is void, and no one can derive title under it, it
being the same as if the payee's name was not on the note.
The statute declares all contracts void that are tainted with
usury, even in the hands of a *bona fide* holder, and courts have
uniformly held them so.   *Lowe* v. *Waller*. Doug. 736.   It
was under an impression that an usurious endorsement was to
be regarded as no endorsement, and that the interest in the bill
remained in the endorser who had endorsed at a discount, that
the action of trover was brought in *Parr* v. *Eliason*, 3 Esp. 210.
1 East, 92, where Lord Kenyon so ably and successfully ex-
ploded this doctrine.   Now take a case similar to the one he
puts ; suppose the United States Bank issues a post note pay-
able to my order, which I endorse over at a usurious discount ;

the bill is then put in circulation, and passes by delivery to a *bona fide* holder; the principle contended for is this, that on payment being refused by the bank, the holder cannot maintain an action on the bill; not against me as endorser, because of the usury in the transfer; not against the bank, because the note was made payable to my order, and my endorsement being void for usury, the note has never been endorsed, and the title remains in me; or, as the counsel said, and as some of the books say, the holder would make title through a corrupt source, and therefore could not recover. The very statement of this proposition shows it to be absurd in the extreme; it is monstrous, and leads to results worse than usury; nay, to downright swindling. If this is sound law, Cram is still the owner of the notes in controversy, and after having received the whole amount of Hendricks, except a discount of one per cent. a month, may recover the value of the notes of Hendricks in an action of *trover*. Such a construction would be repugnant to every principle of moral honesty, and in the language of Judge Johnson, "would convulse the commercial world to its centre." The decision in *Lowes* v. *Mazzaredo* had that effect in England, and parliament immediately passed a law to protect the rights of *bona fide* holders, the principle of which we have incorporated into our new revised code. 1 R. S. 772, § 5. And here I will bestow a passing remark on this English statute, 58 Geo. 3, chap. 93, Chitty on Bills, Phil. ed. 1821, p. 692. It recites, that by the laws all usurious contracts are utterly void, and that in the course of mercantile transactions, negotiable securities often pass into the hands of persons who have discounted them, without any knowledge of the *original* consideration for which they were given; that it is unjust to avoid such securities in the hands of *bona fide* endorsees without notice; and then enacts as follows; " That no bill of exchange or promissory note that shall be drawn or made after the passing of this act, shall, though it may have been *given* for a usurious consideration or upon a usurious contract, be void in the hands of an endorsee for valuable consideration, (not *bona fide* endorsee) unless such endorsee had, at the time of discounting or paying such consideration for the same, actual notice that such bill of ex-

change or promissory note had been *originally* given for usurious consideration, or upon a usurious contract." It appears to me, that from the guarded language made use of in this statute, the framers of the law cautiously omitted any expression that might be construed as admitting that a valid note or bill could be contaminated in the hands of a *bona fide* endorsee by any usurious transfer. The whole object of the statute seems to be to guard against the avoidance of securities in *bona fide* hands, that are usurious in their original formation : and it secures the rights of an endorsee, who pays a valuable consideration, without notice that the security was *originally* given for a usurious consideration, or usurious contract—the whole statute evidently looking to the origin of the security, and not to any impeachment subsequent to its making.

A construction of the statute that would prevent the recovery of a valid note by a *bona fide* holder, merely because usury might have intervened in the transfer, appears so unjust that some of our American courts have repudiated the doctrine of the English court so far as to give effect to the endorsement, for the purpose of transferring the note, but not as creating a liability on the part of the endorser. Learned opinions may be found each way ; but I am at a loss to comprehend how a transaction that is void for usury, and the statute, can be void for one purpose and valid for another, thus partaking of an amphibious character. Among those who have recognized the decision of *Lowes* v. *Mazzaredo* to a certain extent as sound law, a great diversity of opinion exists as to what effect an endorsement at a discount shall have. In *Knight* v. *Putnam*, 3 Pick. 184, it was held that the purchaser, who had purchased at a discount from the endorser, could recover *against the maker*, but it was remarked by the judge, that the *endorser* might set up the sale at a discount as a defence. In *Lloyd* v. *Keach*, 2 Conn. R. 175 it was held that the maker might object to a recovery where the purchaser had purchased at a usurious discount, directly the reverse of the case in Massachusetts ; and an examination of the cases referred to, particularly those from Virginia, will show that many opinions at variance with each other.

But it has been contended that there is a difference in the legal effect of the sale of a bona fide note at a discount, with responsibility of the seller, and a sale without such responsibility; that if the seller merely parts with his interest by endorsement, without remaining liable, and sells at a discount, it is not usurious; but if he endorses and becomes liable, it is in all cases to be considered a loan, and is usurious. *Lloyd* v. *Keach,* 2 Conn. R. 175, establishes the reverse of this doctrine. In that case it was held, that although the note is sold at a discount, the transfer is not for that cause usurious, but it becomes a question of intent with the jury; and in that case, as well as in others, the judges say a note may be sold at half price, or at any price, and yet not be usurious, because the responsibility of the maker may be doubted, or his remote situation render the collection of the money difficult. It appears to me that the same reason may exist in regard to endorsed notes. There are many individuals whose acceptances would be taken at par without an endorser, and others whose acceptances with endorsers would not be taken at 50 per cent. below par. The true test in all transactions of endorsed paper is whether it is a sale, or whether it assumes the appearance and form of a sale merely to cover a usurious loan. If the latter, as Lord Mansfield once said, Cowper, 114, "the wit of man cannot find a shift to take it out of the statute." Let us, to test the principle, assume it as correct that an endorsement at a discount passes the instrument endorsed, but that it does not create a liability on the part of the endorser, and see what consequences result from it. A flour dealer in Rochester has sent his flour to his commission merchant in New-York, to be sold at a given time or given state of the market. He has drawn on his correspondent, and procured his acceptance for $1000, payable to the order of the drawer. Wishing to realize the money, he sells it a discount beyond legal interest, and endorses it. We are supposing a case where the endorsement passes his interest, but that the party is not liable as endorser, on account of usury. The purchaser then endorses it over to another at par, and this other to another at a discount; then, if this doctrine is correct, you have an acceptance good in its inception, and available against the acceptor, but void as

against the drawer who has endorsed it ; good as against the second endorser, who endorsed at par, but void as against the third endorser, who endorsed at a discount. It appears to me that these consequences must result from this doctrine, and if it be so, the inconveniences and dangers in commercial intercourse under such a system would be such that no arguments are necessary to show that it should not be adopted unless the statute constrains us to adopt it. But let us go a little further, and admit, for the sake of argument, that every new endorsement is a *new contract*, as between the endorser and endorsee, and how stands the question of usury on the sale and endorsement at a discount, as in the present case ? The better opinion, I believe is, that as between Hendricks, the purchaser, and Gomez, the maker, the question of usury in the transfer could not be raised. 3 Pickering, 184. But it is said, that as between Cram and Hendricks it is a loan, or in the nature of a loan, and therefore usurious and void. Let us admit it to have been a loan, and how is usury to be maintained ? What is the nature of the contract between Cram and Hendricks, taken in connection with the law as it has been understood in this state ? The contract, if drawn out in form and reduced to writing, would be, that in consideration that Hendricks had paid a certain amount to Cram, he, Cram, transferred, (or pledged, if you please,) the notes of Gomez, and agreed if Gomez did not pay them when due, he, Cram, on receiving legal notice, would pay what ? Not the amount of the notes to Hendricks, but the amount that he had received, with interest. This is the contract taken in connection with the law, and there is *no engagement to pay one cent more then he receives, and the interest.* It is a fallacy to say the endorser agrees to pay the whole amount of the note, where he sells at a discount, if the maker fails to pay. He only agrees to pay back the amount received, with interest ; and it is only in cases where he sells for the whole amount that he becomes responsible for the whole. I confess that in this view of the subject, I am unable to discover any pretence for an allegation of usury.

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

Under all the circumstances, and in every view of this case, I feel constrained to consider it a fair sale of valid notes, brought into market by this holder, and why is this sale different in principle from a sale of *dollars* or *sovereigns?* the former of which have fluctuated in value during the present year more than 1 per cent., and the latter more than 10. Why then is this sale to be construed into a loan? The construction is merely technical; a loan, by implication and construction, against fact. We are not required to extend the application of the statute, by refining upon its meaning beyond its plain import and design. Motives of policy do not require us to extend it to doubtful cases, and the question is of such importance, and has so long been acquiesced in as sound law, that even if I had doubts whether in the first instance it was correctly settled, I should not feel warranted in unsettling the law without clear and conclusive reasons for doing so. To me they do not so appear; and the question, to say the least, is doubtful, whether the supreme court have erred. Decisions are to be found sustaining the opinion of the court; the rule which they have adopted is equitable; and I wish, as far as human imperfections will allow, to see stability in our judicial decisions. It is important to every one to have the law settled, that we may know what it is, and not have it undergoing constant changes. If the statute is to be *extended* to the sale of valid securities, let the legislature extend it by positive enactment. And here it is worthy of consideration, that our laws have recently been revised, and yet the legislature have not thought it expedient to correct by legislation the decision of the supreme court The principle of that opinion had been frequently reiterated by the court and at the circuits. It was well understood, and yet the legislature have left the law in that particular as it was. In several other instances the legislature have changed the laws from what they had been declared by judicial construction; as in the statutes in regard to *double costs*, in relation to the presumption of law relative to wills, and so to set offs. That the legislature have left the *usury law* without changing its construction, affords a strong presumption that they considered it correctly construed, and intended to leave it as the court had decided. A bill or note commands a better

price in market from being endorsed, and unless the owner, who is supposed to know the names on his bill or note, is willing to endorse, no prudent man would purchase, unless at a discount large enough to cover the risk. If an endorsement cannot be enforced when the note is sold at a discount, there will be no use in having an endorser, and thus the value of a bill, in other respects perfectly good, will be essentially impaired when carried into market.

Immense sums of money in our commercial cities are passing in the shape of bills, notes and acceptances, and their value, from a thousand circumstances, must necessarily vary. By overturning the opinion of the supreme court, capital, which may have been invested in good faith, under what has been considered the law may be lost, or put in jeopardy. We may subject parties to the penalties of usury where no usury was intended, and all to enable one who, on receiving the price agreed upon, has endorsed a valid note, and thus by his name, given a guaranty of its purity, to take advantage of his own wrong ; to pocket his ill gotten pelf, and shelter himself under a technical case of usury, from refunding the money which he has actually received. I am not prepared to sanction such injustice, and am for affirming the judgment of the supreme court.

By Mr. Senator MAYNARD. There are two statutes bearing upon this case, to which it is the duty of courts to give effect ; one, the statute against usury : the other making promissory notes negotiable.

The interests of a commercial community require that such notes should be the subject of sale and transfer, so as to be valid and available in the hands of the holders, and that is the purpose of the statute giving them their negotiable quality. To purchase a note, is a perfectly legal transaction ; to purchase it for less than its face, is forbidden by no principle of law or morality. Whether there be in such a sale and transfer a violation of moral obligation, must depend upon the fact whether one party shall or not take an undue advantage of the circumstances or necessities of the other. To constitute a violation of the statute against usury there must be a loan,

and the true question presented in this case is, whether the transaction was a sale of the notes, or a loan of money. The sale of a note being a legal transaction, it must be deemed valid until it shall be proven to have been done merely as a cover to a loan and in evasion of the statute. Such cases always present a question of intent which must be determined from the circumstances. In this instance they are few and indecisive. The declared object in the disposition of the notes was to "raise money." This is an indefinite expression, and applies as well to the sale of property, as the discounting of a note. It is not the usual or appropriate language when the object is to borrow money, but implies rather the procuring of money by means other than a loan, and the giving for it an equivalent other than a promise of re-payment. But the material circumstance relied upon in proof of the alleged usury is the fact, that the vendor endorsed it, and thereby gave his own guaranty for the payment of the note. It is insisted that such endorsment, in intendment of law, converts the transaction from a sale into a loan, and the reservation of a premium higher than the legal rate of interest renders it usurious. This hypothesis excludes proof of actual intention, and refers the transaction to the judgment of the law.

In searching for lights to enable us to determine its true character, our view is first directed to the decisions of own our judicial tribunals. In 1816, a case precisely similar as to facts was presented to our supreme court. *Braman* v. *Hess*, 13 Johns. R. 52. There, as here, the action was by the *endorsee* against the *endorser*. A note of $343 had been transferred upon the extravagant discount of 90 dollars. The court held that the endorser should be permitted to prove the amount of discount, and the endorsee was entitled to recover the real consideration for the transfer, the amount paid and the interest upon that sum. There was no discussion in that case of the question of usury, but the court said that the maker of the note could not be permitted to prove in a suit against him that the note was transferred upon a discount, which, with the decision upon the other point, necessarily implies that the transaction was in no respect usurious. This decision can be sustained only on the principle that the transaction was a sale of

the note, and not a loan of money.  It was objected to this decision that it was not entitled to the full weight of authority, because it was pronounced by the court upon submission, and not upon argument.  Perhaps, without the implication of great disrespect to that tribunal, the objection might be admitted to have some force if it were the only instance in which the same principle had been brought to its consideration, or if it had never enjoyed the benefit of full and solemn argument to aid its investigatons; but the reverse is the fact.  In the year 1817, the cause of *Munn* v. *The Commission Company* came before the court, and by its direction was twice argued upon the identical principle involved in the previous decision. The clearest intelligence, the greatest resources of genius and knowledge, and the profoundest research were exerted and exhausted upon the subject in those arguments.  Then, if not before, the principle was fully considered and deliberately decided.  The previous case was brought in review, and received full approbation.  The last case was an action by the endorsee against the acceptor of a bill, which had been discounted at the rate of two and a half per cent. a month.  The question upon which the court labored was, whether the bill was valid and available in the hands of the payee, or whether he merely lent his name for the benefit of the drawer.  Upon the satisfactory ascertainment of the fact that the bill was valid and available in his hands, and that he might have maintained a suit against either the drawer or the acceptors, the court held that the transaction was not usurious.  At the same time the court decided two other cases upon the same principles, in favor of the same plaintiff against the maker and endorser of the same bill.  The court furnish a rule applicable to all similar transactions, and declare the true " test to be in distinguishing between the cases where the discount of a bill, at a higher premium than the legal rate of interest, will render the transaction legal, by considering it the purchase of a bill already perfect and available to the party holding it, or where it will be illegal as a usurious loan of money.  The principle is too well settled to be questioned, that a bill free from usury in its concoction may be sold at a discount, by allowing the purchaser to pay less for it than it would amount

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

to at the legal rate of interest for the time the bill had to run. The reason is obvious; as the bill was free from usury between the immediate parties to it, no after transaction can, as respects those parties, invalidate it;" and it was asserted to be equally clear, "that if a bill or note be made for the purpose of raising money upon it, and it is discounted at a higher premium than the legal rate of interest, where none of the parties whose names are on it can, as between themselves, maintain a suit upon it when it becomes mature, provided it had not been discounted, that then such discounting would be usurious and the bill would be void." Here a construction was given to the statute against usury, applicable to both kinds of negotiable paper, and upon the identical point now before this court. A plain rule was fixed to mark and distinguish legal from usurious transactions. Where a note was made to raise money, and consequently not available till it was sold, the discounting at a premium higher than the legal rate of interest, was declared to be usurious, because the object was to borrow money, and the mode of doing it an evasion of the statute ; but where the note was made in the course of business, given for value, and available in the hands of the payee, such discounting was declared to be legal, because the transaction was a sale of the note, a thing of value, and not a loan of money.

These decisions did not purport to give a new construction to the statutes, but it was deemed an exposition of the law as it had long been settled in England. I shall not scrutinize the English authorities which were then examined, and seem to warrant and sustain the judgment to which they led ; but to attain a clear view of the progress of decisions, it is necessary to refer to one which, in its consequences, led to the assertion of a contrary doctrine. In 1800, the case of *Parr* v. *Eliason* was decided in England. The question was the same as is now presented in this case. Valid paper had been discounted at a premium higher than the legal rate of interest. It was contended that the transaction was usurious. The court would not hear the counsel in support of its legality ; and Lord Kenyon declared that the commercial prosperity of England depended upon its credit, which was sustained by negotiable

paper. He felt alarm from apprehension of the consequences of declaring such a transaction usurious. He insisted that courts had gone far enough in the work of construction, and that the words of the statute did not require it. This remained the unquestioned law of England until 1816, when the case of *Lowes* v. *Mazzaredo*, 1 Starkie, 385, came up for decision. Lord Ellenborough, who had been counsel in the case of *Parr* v. *Eliason*, and advocated the doctrine rejected by the court, then occupied the place of Lord Kenyon upon the bench. In that situation and in this case he succeeded in establishing the doctrine which he had unsuccessfully advanced as counsel in the other. He believed the first was not law, and he did not take the view, or appreciate the reasoning of Lord Kenyon. That decision is the foundation of the doctrine insisted on by the plaintiff in error, and the chief reliance for the reversal of the judgment rendered in the court below. It may be useful to contemplate the practical effects of the two opposite principles, and ascertain the judgments which the communities whose business and interests they were to affect, have pronounced upon them. The opinions of courts are pronounced in their decisions; those of legislatures and entire communities, are declared in their laws. Time enough has elapsed since the decisions in this state, to test the practical effects of their principles; and what have they been? Have they been followed by a train of desolating calamities? Has a horde of greedy insatiable usurers been freed from the restraints that bound them, and lisensed to deprecate upon the community? Has the prosperity of the people, eminently enterprising and commercial, been diminished, or the state checked in its career of advancement? If such had been the fact, the voice of a suffering people would have been heard, and their power exerted to prevent the evils induced by this construction of the statute. This very statute has been subjected to the ordeal of severe and deliberate revision. In the work of revision, judicial decisions were as freely examined as the laws, and received the approving sanction of legislative enactments, or of equally solemn rejection. The only material alteration made in this statute was an essential relaxation of its rigor, or rather a total abrogation of one of its most effective principles. By the

decisions of our courts, it has become established that a secu-
rity usurious in its inception retained its original taint in all
hands to which it might come, however free from actual
transgression. The legislature had before them all the prin-
ciples established in the construction of that statute, and ac-
quiesced in those now in question, and repudiated the others
referred to, by enacting that a security brought into existence
by a usurious contract, should be good and available in the
hands of an innocent holder. This is the answer which the
legislature and the community have given to the inquiry as to
the practical effects of the principles of construction applied
to this statute.

The consequences of the contrary decision in England are
easily ascertained. The alarm felt by Lord Kenyon when
the doctrine was first advocated by Mr. Law, extended itself
to the whole kingdom, when he, as Lord Ellenborough, and
his associates, gave it the establishment of a judicial decision.
We have judicial authority for the fact that " the effects of the
decision in the case of *Lowes* v. *Mazzaredo* were soon felt on
the negotiability of commercial paper, and the legislature were
obliged to interpose." Such was the shock given to the nego-
tiability of bills, that the act of 58th of George 3d, (less than
two years after the decision,) was passed to restore public con-
fidence." The act, it has been well remarked, " almost en-
tirely excludes negotiable paper from the operation of the stat-
ute against usury." It is very immaterial, therefore, whether
the case of *Lowes* v. *Mazzaredo* be followed in England or not.
The legislature have so limited the range its operations, that
its application cannot be frequent, or its effects extensive. It
may not be inappropriate to remark, that the decisions cited up-
on the argument in this case, from Massachusetts and Kentucky,
were made in construction of statutes not now in existence.
They have given place to others of far milder provisions.

We are now asked to make a dangerous innovation upon
what has been deemed the settled law of the state. If the
statute requires it, our duty impels us to make it. But it
should be clear and palpable that an erroneous construction
has been given, before we abrogate deliberate and solemn ad-

judications, and establish principles that must affect extensively past transactions of business, and put in jeopardy property to a vast and unknown amount. It is now insisted, that the transfer of the notes in question, innocent and legal, as the law has been expounded, was usurious and void. The reason assigned for giving this character to the transaction, is, that the payee of the notes upon the transfer endorsed them, and thereby gave his own guaranty for their payment. This circumstance, it is contended, changes the transaction from a sale of the notes, a contract honest, innocent and legal, into a loan of money, forbidden by the statute, usurious and void. Let us trace this doctrine to its consequences. The effect of the endorsement and consequent guaranty, is to enable the vendor, so far as he is concerned, to make a better bargain, by diminishing the risk of the vendee. The doctrine in practice, then, leads to this result: that the transfer of these notes *with the guaranty*, at a discount of twelve per cent. was usurious and void: but the transfer of the same notes *without the guaranty*, at a discount of fifty per cent. would have been a moral and legal transaction. This would make the law strict to a fault where relaxation is necessary, and lax to a vice where strictness is essential. The object of statutes against usury is to prevent extortion; to deter the heartless man of money from preying upon extravagance, folly and necessity; but this construction would aid the purposes of the merciless extortioner, increase the calamities of the necessitous, by closing one prolific source of relief, and in fact promote the very objects the statute was designed to prevent.

It is essential to ascertain the legal effect of such an endorsement. When the transfer is by the payee, as in this case, the endorsement is necessary to give the vendee title. It is admitted that the endorsement may be special, and the vendor thereby protected from responsibility entirely, or limited to such as the law would permit and sanction. We must therefore ascertain the nature of the endorsement, and thence determine the extent of the guaranty which it creates or implies. When endorsements are made in blank, the law defines their liabilities. It has done so in this case. The reasoning in support of the doctrine, that such a guaranty renders the transaction

usurious, is founded on the assumption that the liability created by the endorsement is for the payment of the whole amount of the note; upon no other supposition can there be usury in the transaction. But such is not the fact. The endorser is liable only for the amount received upon the transfer, and interest upon that sum. The endorsement then is *special,* and limits its responsibility; the law has given it that character and extent. That constitutes a fundamental principle of the decisions of this state; of the English authorities upon which they were founded, and is embraced in the judgment now under review. Where then is the usury? To constitute a violation of the statute, there must be not only a loan, but an agreement to pay for it a premium higher than the legal rate of interest. Where exists such agreement in the case contemplated? Who agrees to pay such illegal premium? Not the maker, who alone can be made to pay it, for he had full consideration for this promise and pays no usury, if he pay the whole amount of the note transferred. The vendee who endorsees, makes no such agreement; his contract is, that he will not in any contingency, pay a premium higher than the legal rate of interest. He agrees that if resort be had to him, he will pay only the amount he received, with legal interest upon that sum; and upon such payment he is entitled to a re-transfer of his note. In what then consists the agreement that constitutes usury? If the transaction be regarded as a loan, there is a total absence of all agreement or liability, as between the parties to the contract, for the payment of any premium higher than legal interest. The vendee runs the chance of collecting the excess of the note over the sum paid of the maker, who is legally bound to pay it. But it may be said that although the vendor makes himself liable to the vendee only for the amount he receives and legal interest, yet by his endorsement he renders himself responsible to a subsequent holder for the whole amount of the note. The answer is, such is not the agreement, and he can only incur such responsibility from his inability to prove notice to the holder of the consideration for his transfer, and may always protect himself against that extent of responsibility by expressing, in writing, exactly the liability which the law attaches to his endorse-

ment. Usury has never yet been predicated of the inability of a party to prove the legality of his contract, without proof of corruption.

We shall not have a full view of the subject without tracing the effects of the doctrine insisted on still farther. If the transaction under consideration be usurious, and the endorsement consequently void, what becomes of the note? On this point opinions are certainly not harmonious. The advocates of the doctrine do not agree; some insisting that the usurious endorsement has a retrospective operation, and makes the note void until it is cleansed of its acquired impurity; others maintain that the endorsement only is contaminated, and the note remains valid and available. Let us ascertain the consequences resulting from each of these alternatives. If the note be made void, then the maker is absolved from the performance of a legal contract by another contract between other parties, and with which he had no concern. Usury therefore is made, in its consequences, to avoid not only the contract which is supposed to be usurious, but another antecedent contract, admitted to be free from its contamination. This surely gives to the statute unwonted potency; a power to destroy valid and lawful contracts, to prevent or punish those that are forbidden. Upon the other supposition, that the endorsement only is void, whose property is the note? Can the usurious endorsee, who obtained possession of it by a corrupt agreement, make good title to it through a void endorsement? This would give to his contract a character abhorrent to the purity and the sanctity of the law, and make it half corrupt—half legal—wholly void, and yet possessing the essential qualities of validity. But if this view be incorrect, and the usurious endorsee cannot make title to the note, it results that the note remains the property of the vendor and endorser, and that he can maintain tróver for it against the unlawful possessor to whom he transferred it, if he can acquire possession of it, he can collect the amount of the maker, who cannot resist payment. But the vendor has sold it once, and received the consideration for it, which can never be recovered back, because it was acquired by a corrupt agreement, a void contract; he will therefore, without scruple, keep that, because the law protects him and

justifies the deed, and conscientiously and morally, because legally, add to it the amount of the note. If that be the conclusion to which the doctrine leads, then there is truth and force in the sentiment of a judge of another state: " that is swindling, and that too under the sanction of a court of justice, worse than the most grinding usury."

Many cases were cited on the argument in support of the doctrine contended for by the plaintiff in error. Let us enquire whether it has the sanction of authority. The case of *Churchill* v. *Suiton*, 4 Mass. R. 156, in which is the quoted remark of Chief Justice Parsons, does not sustain it, because *no such point was decided.* In that case two questions were presented : 1. Whether the endorsers were competent witnesses to prove the contract usurious ; 2. If they were, whether from their testimony as disclosed in the case made by agreement, the contract was usurious. The court decided that the endorsers were incompetent witnesses, and then expressly declared that it was unnecessary to decide the other question. The chief justice, however, proceeded in a course of remark upon the point not decided, and said, with more brevity than illumination, " that if a sale under such circumstances is not to be considered to be usurious, it is not easy to conceive what sale is within the statute." That was the case of a note made expressly for the purpose of raising money, and sold at an illegal discount. The transaction was clearly usurious, and if that circumstance had been adverted to, it would have furnished abundant ground for the opinion indicated for other reasons. It does not follow, from the language of judges upon points not decided, that they would decide according to the indication, if decision were necessary ; or if they did, that they would not be able to give other and better reasons for their judgment, especially when better reasons were obvious and abundant. The distinction between *accommodation* and *business paper* was afterwards taken in the same court. It is sufficient to take from that case the weight of authority, that the point was not decided, and it may be remarked that the decision is not authority, in this state, for any purpose, our decisions being opposite on the point decided.

In the case of *Knights* v. *Putnam*, 3 Pick. 184, decided in the same court near twenty years afterwards, and in which the case of *Churchill* v. *Suiton* was reconsidered, it was held that usury upon the transfer of a valid promissory note cannot be set up by the maker against the endorsee. That was the point for decision. No question was presented between endorser and endorsee, but the judge, in delivering the opinion, cites the cases of *Braman* v. *Hess*, and *Munn* v. *The Commission Company*, in this state, with approbation, and dissents from the doctrine of Gould, judge, in the case of *Lloyd* v. *Keach*, decided in Connecticut, and declares that doctrine to be contradictory to the decisions in this state, and that Judge Gould overlooked the important distinction between *accommodation paper*, having no value until it was negotiated, and *business paper*, given for full consideration. That decision is in harmony with those in this state.

In *Whitworth* v. *Adams*, 5 Randolph, 333, the action was by an innocent *holder* against the *makers* of a promissory note, made for the accommodation of the payee, and sold for him, by a broker, at a discount of three per cent. a month to a person who had not knowledge that it was made to raise money, who transferred it without endorsement. It was decided that the transaction was not usurious. It is immaterial whether that decision was right or wrong, because it is manifest that the question presented in this case did not exist in that; but Judge Colton, who was of the majority in reference to the decisions in this state on the point now in question, said, "It has been held in New-York, and is supposed there to be the doctrine in England, that a sale even by the payee, whose endorsement is necessary to make the paper negotiable, at a greater discount than legal interest, is not *per se* usurious. I strongly incline to think that this doctrine is correct. *As between the payee and his immediate endorsee*, the liability is no greater than in the case of an ordinary note. It may go no farther, and if the money is not paid by the maker or drawee, the holder can only recover from his immediate endorser the sum he paid for the note or bill."

The case of *Gaither* v. *The Bank of Georgetown*, 1 Peters, 37, does not conflict with the decisions in this state. That

was not the case of a valid note transferred upon a discount, but a valid note, delived as a collateral security for the payment of a usurious loan. The decision was that the usurious endorsee could not maintain a suit upon it, because the contract upon which it was received was void ; not that the note in suit had been sold at a premium greater than the legal rate of interest, for it had not been sold at any discount ; but a loan of money on usurious consideration had been previously made, and this note delivered as collateral security for its payment. The court likened it to the case where there is a loan for a certain amount for usurious interest, and the bond of a third person for a less amount is taken as collateral security for the re-payment, with usurious interest. It was exactly that case, and there can be no doubt that the admitted usurer had not title to the note. The security was valid, but it did not belong to him. In the case now presented for the decision, the notes were not delivered as collateral security for a previous loan, admitted to have been usurious, but the main question to be determined is whether the transaction was a sale of the note or a loan of money. In that case the court distinguish it from a sale of a valid note ; and Judge Johnson, who delivered the opinion, pointedly says, "that the rule cannot be doubted, that if the note be free from usury in its origin, no subsequent usurious transaction respecting it can affect it with the taint of usury." This asserts, in the broadest and most unqualified terms, the doctrine held in the decision in this state.

Nor is it perceived that there is any thing in the case of *Lloyd* v. *Scott*, 4 Peters, 205, applicable to the facts or principles involved in this. There was a loan of five thousand dollars, and the borrower gave to the lender a deed, securing to him a rent charge of five hundered dollars a year upon certain real estate, with a right to distrain for such rent, and containing a covenant for the release of the rent charge, upon payment of the five thousand dollars after five years. The court were opinion that it was a loan upon greater than legal interest, with intent evade the statute, and decided that the contract was usurious, and that the grantee of the borrower, of the lands upon which the rent was charged, could set up the usury in an action of replevin brought for certain articles

distrained for the rent. Judge McLean, who delivered the opinion of the court, says the "intent with which the act is done is a material ingredient to constitute this offence." It being clear that there was in that transaction a loan, and that the mode of securing its repayment was a contrivance by which the lender was to get more than legal interest, in evasion of the statute, the decision that the contract was usurious was obviously correct. The judge further remarks, " that usury has long since lost that deep moral stain, which was formerly attached to it, and is now generally considered as illegal or immoral only because it is prohibited by law."

In the case of *Lloyd* v. *Keach*, 2 Conn. R. 175, the suit was against the maker of a business note, by the endorsee, to whom the payee had endorsed and sold it, at a discount greater than legal interest. There it was contended that the transaction between the payee and the endorsee was usurious, and consequently that the endorsement was void, and conveyed no title to the holder. The majority of the court held the transaction not usurious, and Chief Justice Swift declared the rule to be, " that a note may be sold at any discount, but though there be a sale in point of form, if it be merely colorable, to evade the statute, and in substance a loan, then it will be usurious." " The warranty will be an item of evidence to ascertain the nature of the transaction." According to that decision, such a transaction was *prima facie* a sale, and valid. The intent was held to be a question of fact for the determination of a jury. The court were divided, but the distinction between the accommodation and business paper does not appear to have received attention, certainly not from the minority.

In the case of *Ruffen* v. *Armstrong*, 2 Hawks, 411, the suit was by the endorsee against the payee, and the transaction was held to be usurious between them, although effected through an agent. A note of upwards of $900 had been sold for $600. It was treated as accommodation paper, and the transaction pronounced usurious. The court were aware of the distinction between accommodation and business paper, and confine their decision and remarks to that of the first description. One judge cited the opinion of Judge Spencer, in relation to accommodation paper, and declared that every po-

sition taken in the opinion quoted, applied entirely to the facts in that case.　Another remarked that " whether the assignee of a bond, upon a usurious consideration, can recover against the obligor, when the bond was given upon no illegal consideration, this case does not make it necessary for us to decide, *because this is not that case.*"　The security being made for the purpose of raising money, the transaction was unquestionably usurious ; and that decision does not conflict, but harmonizes with those on the same subject in this state.

I shall not particularize more of the cited cases.　Most of them appear to have no direct bearing upon the points, or application to the questions under consideration.　In general those decisions were, in cases of unquestionable loans, secured in a manner evasive of the statute, with intent to reserve interest higher than the legal rate ; or they were in actions instituted upon accommodation paper, and the transactions clearly usurious, although presented to the courts under various aspects.　The distinction between accommodation and business paper has not in all cases been regarded, but whenever it has been, the decisions have not been essentially variant from those in this state.　2 McCord, 173.　3 id. 365. 4 id. 402.　It is true, there is not a uniformity in the decisions on the subject of usury.　The English decisions are not in unison, and the American are not harmonious.　Courts have taken different views, and judges have reasoned differently, and come to variant and even opposite conclusions.　These conflicts of opinion were unavoidable, and the judgments to which they led are not to be reconciled ; but the decisions of courts are not more variant in the construction of the statutes than opinions upon the subject of usury.

The doctrine now contended for is traced, with clearness and certainty, no further than the case of *Lowes* v. *Mazzaredo*, the history of which has been given.　That may have led to some confusion in the decisions in this country, and it did require at the time, in the country in which it was pronounced, the exertion of legislative power to prevent its threatened calamities.　I have treated the case of *Lowes* v. *Mazzaredo* as analogous and in point, because it was so considered upon the argument, and the language employed in the decision so im-

plies. Yet it is evident from the facts that the bill on which the suit was instituted was accommodation paper, *made* and *endorsed* by the *payee*, and sent into the market expressly to raise money. There is consequently no difficulty with the decision. The paper had no value until it was negotiated, and the transfer of it upon an illegal premium was a usurious transaction ; and if the decision had been put on that ground, it would not have caused disturbance. It would then have harmonized with previous adjudications, and would not have created doubt or confusion.

Extracts were also read upon the argument from a celebrated elementary writer, (*Pothier*,) in support of the plaintff's doctrine; that writer, certainly *of rare intelligence*, says ; " When the seller of the claim guarantees that it shall be duly paid, it cannot be lawfully purchased, either in the forum of conscience or according to the rules of law, for a price less than the sum due. Such a purchase can no more be lawful than a usurious loan; for when I sell you a claim for 1000 livres for 900, which I engage to discharge myself if the debtor does not ; it is evident that it is the same thing as if you lend me 900 livres, upon condition of my paying you 1000 at the end of a certain time." These remarks are made without reference to any particular statute of usury, and the writer proceeds to specify exceptions to this general rule, in which the purchase would be lawful, if not conscientious. Without discussing the question whether the two cases supposed are the same, against which something might be said, and names of authority arrayed, it is evident the writer contemplates that the vendor shall guarantee the payment of the whole amount of the claim which had been sold for a less sum ; and that is the transaction which he pronounces to be contrary to law and good conscience. His remarks do not apply to the case of a guaranty to pay not the whole amount of the claim sold, but only the *sum paid* for it. Upon his own principles such a transaction would be honest and lawful. The two transactions are suceptible of easy illustration. To raise money, a man sells a horse worth one hundred dollars for eighty, and covenants that at the expiration

ninety days he will take him back, and pay a $100 for him—that is usury ; but if he sell in like manner, and covenant that if the vendee choose, he will take back the horse unharmed at the like time, and re-pay exactly the money he received for him and legal interest, where is the usury ? The writer in contemplation gave to the guaranty an extent of responsibility which the law does not impose. As to the violation of the behests of conscience, the moralist might with equal propriety and justness condemn all sales of property for less than the actual value. It is also equally immoral, except so far as the law furnishes an excuse or justification, to take advantage of the scruples of concientious men who feel bound to obey the statute, and borrow money at the legal rate when its actual value is known to be greater. The morality of every transaction depends upon its own peculiar circumstances. If imposition be practised, or advantage taken of ignorance, necessity or confiding credulity, the transaction will be immoral, although adjusted with precise exactness to legal requirements. The practice of morality will be more extensively and powerfully encouraged by the deep and universal inculcation of its principles, than by the application of abstract, arbitrary, statutory provisions, affecting matters of business, to the infinitely diversified circumstances of human action and condition.

Courts and individuals sometimes speak of usury laws with a sort of idolatrous veneration, as though they were of divine origin or essence—the main protection of property, and chief safe-guards of civil society. One judge has declared that they "have prevailed in all civilized countries and in all times." Language of such bold and imposing import is apt to influence the mind without perception, and hurry it to conclusions without conviction. Opinions acquire, from long transmission, the attributes of wisdom, and continue to command assent without investigation, because they have been embraced with unanimity. The mind fails to grasp and estimate the changes wrought in the condition of mankind, and clings to old maxims and rules long after the reason for them has ceased to exist.

The argument in this case took a wide range, and perhaps the inquiry may be indulged without involving extraneous considerations, whether there has been through all time, and is now, throughout all christendom, this harmony and universality of opinion. It is t rue the Jews were forbidden to take *any thing* for the use of money from those of their own nation, but were unrestricted in their exactions from their gentile neighbors. This was no statute for the regulation of the price of money. The peculiar condition of the Jews rendered it proper that they should be restrained from all exactions from each other; but the ordinance admits the principle that where any compensation was admissible, the amount of it should be left to individual agreement. The Romans, Tartars, Arabs, Chinese, and Hindoos, may have had usury laws, but their example would not be held in high estimation by commercial communities in point of policy, nor by christian nations in respect of morals. England has had usury laws for two hundred and fifty years, but England claims to have enjoyed the blessings of civilization for a much longer period. In that country usury forfeits all securities contaminated with it, and her courts exercise an acute perception and ceaseless vigilance to discover it, and an unsurpassed inflexibility of purpose to enforce her statutes and punish all infractions; yet the legislature has been compelled to interpose to protect the community from the evils apprehended from judicial construction, and more recently has instituted an inquiry as to the practical operation and effect of those laws, with a view to their modification or repeal. In *France* interest is limited to five per cent. on such securities as mortgages, and six on commercial transactions; but by a *bonus*, paid beforehand and not forbidden, money is raised to its market value, and the law rendered nugatory. In *Holland,* if there be any statute against usury, it is obsolete, and the price of money varies with the market. *Hamburgh:* The common law of the German empire is six per cent., but it is not applied to commercial transactions; the bill market is free. The rate of interest on accounts between merchants is generally five per cent., but discount varies greatly. *Frankfort:* Five per cent. on real security, but on bills no limit. *Bremen :* No limit. *Russia :* Legal rate six per

cent., but the law constantly avaded; the imperial bank at Petersburgh discounts at a rate fixed, every fortnight. *Austria :* Legal rate six per cent. on real estate, but on bills unlimited. *Prussia :* Five per cent. on real property, but unlimited on personal security. *Trieste :* Six per cent., but on bills, either legally or practically free. *Leghorn :* Six per cent. between merchants on accounts, but no law regulating interest on commercial transactions. *Genoa :* Legal rate four per cent., but left free to individual agreement. *Spain :* Six per cent between merchants, but money is free. *Portugal :* The ancient and close ally of England has usury laws, but they are evaded by means of a bonus or premium.

This review, comprising the most of commercial Europe, shews, by the test of actual experience, the judgement of mankind upon the policy or utility of statutes against usury. On the continent generally, they are a dead letter. In some states there are none, in others they are obsolete and wholly neglected; and where they do exist, the facility of evasion, by means of a bonus or premium actually paid and not forbidden, renders them inoperative. Generally, they are confined to mortgage securities, while mercantile operations are left unshackled to the agreement and mutual interest of the parties. England is the only country in Europe where usury laws with severe penalties exist or are enforced with rigor, and there it is said the actual price of money is greater than on the continent.

In this country, there is also much diversity of opinions. Several of the states have usury laws, forfeiting the security and subjecting the usurer to penalties, copied substantially from the English statute. Such was the law in *Massachusetts*, but it has been repealed, after an existence of more than 40 years, and its place supplied by an act forfeiting only treble the amount of interest exacted. In *New-Hampshire* and *Pennsylvania* the securities are not made void, and securities for the payment of money may be purchased at any discount, with incuring the penalties of usury. In *Rhode Island*, only the interest is forfeited; the principal is recoverable, and the statute is seldom if ever enforced. In *Missouri*, the legal rate of interest is six per cent., but the parties may contract for ten, and

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

if more be exacted, the *interest* is forfeited. In *Illinois*, there is no statute regulating the price of money. *Kentucky* adopted the English statute, with all its penal provisions, but has abolished it (1819,) and substituted one fixing the rate of interest without penalties; the principal and legal interest can now be recovered under any circumstances. *Ohio* tried a usury statute with rigorous penalties for 20 years, (from 1804 to 1824,) then repealed it, and enacted another, merely fixing a rate of interest, but imposing no forfeiture. *Alabama*, after thirteen years' trial of a statute against usury, fixing a rate of interest lower than her neighbors, Louisiana and Mississippi, changed it for one without restriction. The opinion of Judge Clay has been introduced to establish the fact that the change " was deleterious in the extreme." It may have been so, but the facts in the cases in which that opinion was expressed do not warrant any general conclusion unfavorable to the policy of a freedom from restriction. The large sums specified in the contracts on which the suits were instituted, were penalties, the payment of which might have been avoided by punctuality. It was only on the failure to pay on a given day that they became demandable. These penalties were in the nature of liquidated damages, which may exist wherever contracts are made, with or without statutes of usury. Those contracts were not for loans of money, but were made on sales of property, or in other operations of business, and the penalties inserted to insure punctuality ; they were made also the year after the alteration of the law. It is not improbable that the previous restrictions may have deterred or expelled capital from the statute, and the removal may at first have superinduced extravagance. The situation of the state was peculiar ; its settlements new, and in a state of formation ; its soil susceptible and rich, yielding luxuriantly to the hand of labor ; its population ardent, enterprising and adventurous, realizing at that period immense profits from the employment of industry and capital ; the condition of the world unsettled and delusive, from the recent transition from war to peace, and inviting to hazardous speculations : indeed extravagance seems to have pervaded every department of business. It was per-

tinently remarked, on the argument of the same causes, that the highest rates of interest were not more enormous than the price of lands and slaves. Against the opinion of Judge Clay may be opposed that of a judge equally eminent, of Ohio, who, after seven years experience (from 1824 to 1831) in that state of freedom from restriction, under circumstances far more auspicious to a fair test and correct conclusion, says : " It is my impression that money is now obtained on safe security, on better terms than it was while the penal act was in force."

This enquiry might be extended farther with a similar result. It has been indulged to an extent sufficient to illustrate the fact that the opinion and the action of the whole civilized world are in favor of relaxation in the legal provisions, affecting the price and the use of money. The doctrine asserted requires a counter action of this general and powerful tendency, by increased rigor, in their construction. Opinions are also discordant as to the provisions which should receive legislative sanction, where the principles of restraint and regulation are adopted. It is less surprising, therefore, that diversities and contradictions should exist in judicial decisions. Uniformity under such circumstances cannot be expected, It is impracticable, and all attempts to produce it must be fruitless.

Whatever may have been the necessity for statutes against usury at the time of their first enactment, or their immediate use, they were made for other times, and a far different condition of the world. They came into existence before commerce had produced revolutions in business and property, and in the social condition. They were not enacted to regulate transfers of negotiable paper, but existed long before promissory notes were made negotiable by statute. Before distant communities had learnt to increase their comforts by an interchange of commodities ; when manufactures, as a great and distinct occupation, were unknown ; the avocations of men few and simple, and a vast proportion of the aggregate amount of property consisting of real estate—before paper had become the representative of money, extending its capacities, and performing its uses. At that period the dealers in money were few, and those chiefly belonging to a proscribed race. Religious intolerance stimulated and sustained the policy of restriction. Indeed, the stat-

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

utes against usury were a relaxation of the absurd severity of the canon law, by which all interest was forbidden. It was a relaxation extorted from bigotry by the necessities of mankind. Usury laws owed much of the veneration they inspired, and long retained, to the influence of prejudice and intolerance. The spirit of the times condemned the usurer as it did all heretics in matter of faith. The sentiment was universal. It pervaded all classes. The usurer was the object of vulgar prejudice, the " proud man's contumely" and the bigot's scorn. They called him " misbeliever, cut-throat, dog, and spit upon his Jewish gabardine." Acting upon this universal prejudice, and ministering to its morbid cravings. the imperial powers of the monarch of the drama were exerted to confer upon him a deathless infamy. That prejudice has had a long transmitted dominion over the human mind ; but commerce and illumination have limited its sway, and weakened its power. It is now proclaimed from the highest tribunal in the land, that ' usury has long since lost the deep moral stain that was formerly attached to it, and is now regarded as immoral or illegal, only because it is forbidden." If it be innocent in the judgment of mankind, a question arises for the decision of casuists, whether the immorality consists in the practice or the prohibition. Great changes have been wrought in opinion, and greater still in the condition of the world. If considerations of expediency could be tolerated, and if the question be doubtful that they may be, the inquiry might well be indulged, whether it be the part of wisdom to draw tighter the cords of restriction against the general inclination. now, when the spirit of enterprize is abroad, alert and vigorous, searching every recess in creation for hidden treasure, and when every part of the globe is overshadowed by the restless wing of commercial adventure ; when credit is indispensable in every department of business, and the transfers of negotiable paper essential to its aliment and support.

In my opinion the transaction in review was a sale of the note, and not a loan of money ; but if a loan, that there was no agreement in fact or law for the payment of unlawful interest, and that the judgment should be affirmed.

By Mr, Senator SHERMAN. The question for the court to decide in this case is a question of usury : it is important to the parties, so far as it affects their interest, but it is doubly so to this community in relation to future operations in the negotiation and transfer of bills of exchange and promissory notes. The construction of the statute of usury has fluctuated and given rise to many judicial refinements, calculated to produce doubts in the minds of the community ; and it is to be hoped that the decision of this case will be in unison with the spirit and intention of the statute, which we are bound to support. This case has been twice argued before this court and its importance may be seen in the interest it has excited, and the attention which has been devoted to it, not only by the counsel engaged, but the members of this court. The whole field of legal learning on the subject has been travelled over, and the counsel have exhibited a talent and research entitling them to the highest credit, and which cannot fail, I think, to enable us to arrive at the proper conclusion.

The language of the statute of usury is ; " No person shall take any bond, bill, note or security whatever for payment of money to be lent, or to be due or payable by any means whatever, where there shall be reserved or taken above the *rate of seven per cent.* per annum." The statute pronounces all such securities void, and forbids the r esort to any shift, means or contrivance to evade its provisions. This language appears plain and clear, and its provisions so broad that one can hardly suppose it possible for a question to arise on a simple transaction of passing a paper security or note from one person to another, at a discount of more than seven per cent. ; yet such is the case, arising out of the ingenuity of man, which is never greater than when prompted by considerations of interest. Probably one reason why so many refined questions have been raised on this subject, is the propensity of entering into the policy of the law—a consideration that belongs more properly to the legislature ; yet parties enter into it, and judges have often adverted to it in the course of their reasoning. In some cases, and to a certain extent, it is probably unavoidable. The policy of the law is assailed by a certain portion of the community as the circulating medium becomes limited, and speculations

inviting ; but it invariably subsides with business men, and a less rate of interest suffices as the country becomes prosperous and abounds with a sufficiency of capital and wholesome currency. There are a few in all communities who are always at war with this statute, and incessant in their efforts to produce its repeal, or fritter it down by some means or other so as to render it inoperative ; and in all governments, and in every age in which they have succeeded, the result has been a scene of extortion and oppression between debtor and creditor, a connection that pervades the community generally, and affects more particularly the poorer classes. Such a scene has never failed to produce a re-action, and finally to result in restoring the salutary provisions of the statute.

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

I have paid some attention to this case, and particularly so, because the decision of it one way will go further to affect the operation of the statute, and open a wider door to usury, than any case that has come before this court. If any of the provision of this law require modification, let the proper authority apply the remedy on the application of those who complain, and not let in be done by a species of judicial legislation. After examining all the authorities referred to, I have come to the conclusion, and I could come to no other, that this is a direct case of usury, plain and palpable between the parties in this suit, tangible by the defendant on the contract of endorsement, and comes within the latter, meaning and intention of the statute.

Admitting the note to be a fair business note, and available in the first instance, the endorsement of it is a separate agreement between Cram and Hendricks. Although endorsed in blank, the terms of that agreement are well understood and settled in law ; and every endorsee may fill it up, or write it out whenever it becomes necessary. The plaintiff below, Hendricks, has set out the terms of it in his declaration. It was on this endorsement that the note was discounted, and the money loaned ; and Cram became bound by the terms of his endorsement to return that loan, if the drawer of the note did not. It was as clearly a loan as it would have been had he given his own note. Whether I say to a man, let me have a hundred dollars and I will give you my note, or I will give

you the note of A. B. and guarantee the payment, is the same thing in substance ; it partakes of the same nature. Courts of law have given to the term *loan* a wide and extended meaning in relation to this statute, and unless they did so, the law would be evaded by the mere form of names and terms. Thus, discounting paper, according to ordinary practice, has been decided to mean a loan in all cases, particularly where money is advanced. *Bank of Utica* v. *Wager*, 2 Cowen, 712. Wager obtained a discount of in the ordinary way, and it was decided *to be a loan*, and the transaction usury, and on appeal to the court of errors it was decided, that taking interest for 90 days, and calculating it a quarter of a year, was usurious, and advancing money on discount was *a loan*. See also 8 Cowen, 398. Advancing a man's credit instead of cash is a loan. Opinion of Court, by Kent, Ch. J. 16 Johns. R. 367.

Can the transaction in this case be called a *sale of a note ?* This ground was assumed in argument by the counsel for the defendant, but it was not, in my opinion, supported by authorities which bore out the position which they took. There are cases in which a note may be sold, and more than legal interest taken, as stated in some of the authorities, but these are few and depend on peculiar circumstances. There does not appear to be any general principle settle as to a sale of a note, except in two particulars. The *first* is where the owner of the note sells without endorsing it, (except merely to pass the title,) or guaranteeing the re-payment of the money. *Second.* Where the note so sold is attended with some risk or hazard, not of an ordinary nature, and it is for such risk or hazard, which the buyer is willing to assume, that a greater rate of interest has been permitted. 4 Mass. R. 159. 1 Greenleaf, 167. 1 Holt, 256. A man may take a fair *bona fide* note into market and sell it for what he can get, provided he does not endorse it ; the presumption is, that he sells it on account of some hazard, or doubt of the ability of the party to pay. If he endorses it, it is a loan ; but there are no peculiar circumstances attending this case to take it out of the every day practice of discounting a note.

The case of *Munn* v. *The Commission Company*, 15 Johns. R. 44, was referred to, to shew that a note *might be sold,* and

also as a case in point in other respects; but, in my opinion, it does not touch this case. That was the case of an endorsee of a bill of exchange against the acceptor—acceptor of a bill stands in the place of the maker of a note, and would be the case of Hendricks, the endorsee, suing Gomez, the maker. Spencer says a bill free from usury in its concoction *may be sold* at a discount greater than legal interest; being free from usury between the immediate parties, no after transaction can invalidate it between the original parties, that is, between Cram and Gomez, not Cram and Hendricks; and this is the true original meaning of those cases that say subsequent usury does not render the note void between the original parties. Spencer does not say that the buyer can sue the seller; if he could, it would be no sale, for a sale repels the idea of guaranty or return of the consideration money, which would make it a loan. The case of *Munn* v. *The Commission Company* is the first decided in the supreme court that has been considered as making the first inroad upon the doctrine of the statute, and it led on to the case of *Rice* v. *Mather*, 3 Wendell, 62, which went to step further, and extended the meaning of available notes, and tolerating the taking of usury on all business or available paper the moment it leaves the hands of the original parties, and recoverable in a suit against the maker. In that case which was endorsee against maker, it was decided that if two person exchanged notes, they were immediately available, one being a consideration for the other. All such cases are cases of accommodation paper; for what other motive could induce two men to exchange notes? By this operation, all paper can be " *concocted*" in such a way as to render it available. All that remained in the way of the money lender, to enable him to walk completely into the statute of usury, was the right to sue his immediate endorser, without encountering his own usury. A confirmation of this judgment will effect that object, and then I can see no remaining check in the statute that cannot be evaded whenever the parties please. The maker cannot set up *usury*, because it can be shewn that the notes were " concocted" right in the first place by exchanging. The endors-

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

er cannot set it up for the same reason, and who else is remaining that can set it up? This looks to me not only like cooking or "concocting" the statute of usury, but it shews that it is in a fair way of being devoured.

There has not been produced a single case, nor is there one to be found in the books, in point with the case now before us; not a reported case in England or this country, where a suit was sustained by the endorsee against his immediate endorser, between whom the usury was proved; not a case where the open violator of the statute comes into court and asks for judgment against the other party to the usury. A host of cases have been produced and referred to about and upon the subject of usury, and not one to be found in favor of the plaintiff below. What then is the only *thing*, for I cannot call it a case or a report of a case, that looks that way? It is a *nota bene*, at the end of the report of *Munn and the Commission Company*, 15 Johns. R. 44, saying "a judgment was entered in the suit of Munn against Oliver Ruggles, for $4336;" but nothing in the report referring to it. From its terms it must have been added by the reporter, and is not the language of the judges. There might have been an agreement, as is sometimes the case between the parties, that the other suits on the note or bill abide the event of the first. But however it may have got there, it cannot, in my opinion, be considered as any authority, or case decided or reported. The case of *Munn* v. *The Commission Company*, was a suit against the company, who stood in the place of Gomez, the maker of the note, and was not the case of *endorsee* against immediate *endorser*. That case appears to have been decided upon the authority of a prior case of *Braman* v. *Hess*, a case that says nothing about usury or the statute of usury; and it was contended by counsel, and very properly, I thought, that it ought never to have been reported, much less quoted as an authority in any case of usury. No defence of that kind was set up; it is reported without having been argued, and I cannot see that it settles any thing on this subject. If it did relate to usury at all, like the usurer's bargains, nothing appears on the face of it. Yet this case has been the theme of argument, when very probably it had no reference to usury.

The variety of cases which go to shew the case under consideration usurious, are to my mind clear and decisive. I will not tire this court by going over all of them. The first case referred to is *Lowes* v. *Mazzaredo*. Here the usury took place between the endorser and endorsee, as in the case of Cram and Hendricks, and Lord Ellenborough decided it a clear case of usury on the endorsement. In *Chapman* v. *Black,* 2 Barn. & Ald. usury took place between the first endorsee and endorser, and then the note passed away by the endorsee, who had taken usury, to an innocent holder; this was decided to have been usurious on the contract of endorsement. This was thought to be a hard case, and gave rise to the act of parliament protecting innocent holders. Our legislature have passed a similar, act, which protects innocent holders of paper on which usury had been taken before it came to them, when they had nothing to do with it, and were unknowing to the fact. This was as far as the legislature thought it prudent to go in modifying the law; and after this amendment, there can be none of these hard cases referred to. But this is not a hard case : Hendricks is the open violator of the statute, and comes into court and asks you to help him. *Massa* v. *Dauling,* 2 Strange, 1243, was a case of first endorsee against endorser—note £200. One Grace took the note and advanced £197, retaining more than legal interest—decided to be a clear case of usury, on the endorsement. The court say the taking is prohibited on any contract directly or indirectly. The English cases refer both to business paper and accommodation notes, and where the question is between endorser and endorsee, they are put on the ground of the endorsement being usurious.

The American cases I think are equally clear on this point. In 5 Randall's Virg. R. 233, the court say, " A valid note in its inception, endorsed by a party to whom it has regularly come, and he passes it to a third person who takes usury, the transaction is void." This is very similar to the present case. The note was valid, but the endorsement void, as between endorser and endorsee. So 7 Martyn's Louis. R. 408. The note was drawn by Morgan to Saul, who endorsed it to Price, the defendant. Price, as second endorser, passed it to Astor, who retained more than legal interest. This was a valid note in its inception; it was drawn in New-York, and the court de-

cided that by the statute of usury of New-York, which was pleaded, the transaction was usurious. So in the case of *Gaither* v. *Bank of Georgetown*, 1 Peters U. S. R. 43, the judges decided that the endorsment of a note to a stranger, valid in its inception, and passed to the bank as collateral security for a usurious loan, was usurious and void. The bank discounted it at 18 per cent.; and the court say void against endorsee, but recoverable against maker. In 2 Hen. & Munf. Virg. R. 14, a bond was sold, and full amount not paid. The court refused to enquire into the consideration, unless impeached on the ground of *usury* or *fraud*, and then they would go into it. In *Churchill* v. *Suitor*, 4 Mass. R. 156, the defendant gave a note for \$275, payable to Copeland or order. He endorsed it to Bartlett, a broker, who endorsed it to the plaintiff, who took usury. It was contended that this was a sale of a fair note. Parsons delivered the opinion of the court; he says " a note may be sold at a greater discount than legal interest; but this happens where the holder doubts the ability of the party to pay, and sells it without any guaranty; but here the plaintiff took the endorsement of all parties who had any interest in it; if a sale under these circumstances is not usurious, it would be difficult to say what would be." *Lloyd* v. *Keach*, 2 Conn. R. 175, was an interesting case decided in the court of errors, and the whole doctrine fully gone into. The court decided that where a man sells the note of another and endorses it in the usual way, so as to be responsible to the purchaser, and more than legal interest is taken, it is usury; and the jury found so—this was a case of a valid note. In *Powel* v. *Waters*, 8 Cowen, 698, decided in this court, it was held that if the endorsee had knowledge of the usury it was void. Colden and Spencer, who delivered opinions, both agreed in this principle, but differed as to the facts. In this case Hendricks not only had knowledge, but received the usury. In *Dunham* v. *Gould*, 16 Johns. R. 367, the parties stood like Cram and Hendricks; they exchanged notes, as in the case of *Rice* v. *Mather*, which the supreme court decided made them available, one being a consideration for the other. The case was carried to the court of errors and decided usurious. Ch. Kent delivered a long, able and eloquent opinion, in which he goes very fully into the policy of the statute; the

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

salutary effects which it produces, and which similar acts have produced in other ages and countries ; the danger of relaxing it, and the evil effects which have followed its repeal. He quotes Jeremy Bentham, opposed to usury laws, as saying that " we ought not so much as to wish to see *the spirit of project in any degree repressed ;*" and replies, " I hope I may be permitted to wish, that the first experiment of his projects may not be made within these walls. The statute of usury is constantly interposing its warning voice between debtor and creditor; and I am unwilling to withdraw such a controul." These projects of permitting any rate of interest to be taken, have since been tried in Alabama, until the people are perfectly satisfied and sick of them. They are now experimenting upon the people of Illinois. In the 1st vol. Alabama R. p. 209, is a report of six cases, depending on the same principle, and reported together. The reporter says he has taken great pains to collect them together on account of the great excitement produced in the community. The suits are brought on notes and bonds; the amount of some had doubled and trebled in the course of a few months ; on one note 30 per cent. was reserved ; on another 60 per cent.; on others 70 and 80, and in one 120 per cent. a year was reserved. The chief justice in his opinion says, " When the usury law was abolished in 1818, the mischief complained of, was that capitalists would not advance their money unless a higher rate of interest was bid. He was a member of the legislature at the time the law passed ; and it was asked again and again, why not let the owner of money hire or sell it for the best price he can get, like cotton or grain ? I was prepared to support the act, but it needed none ; all appeared to be enamored with the new experiment ; but as events have demonstrated, it has been a most deleterious one. Experience has shewn that what appeared sound calculations of the human mind, as to moral effects, is but folly." He says " none of the rules of the statute of Ann apply here. That was a salutary statute made to prevent and punish usury, and guard against hard and unequal bargains." An advertisement is now publishing in the papers by the school commissioners of Illinois, saying that they will loan the school monies at 20 per cent. a year, and if good security is given, they will take 18.

ALBANY,
Dec. 1831.

Cram
v.
Hendricks.

I feel satisfied that an affirmance of the judgment in this case would not only be against the letter and spirit of the statute, but that the consequences would be most injurious. We should in effect say to all the banks in this state, you are at liberty to take any rate of interest you can agree upon, in discounting all the business paper that is offered, where it has more than sixty-three days to mature. Nothing but the statute of usury now restrains them from taking more than legal interest ; and this restraint is removed from them, who are endorsees in all cases, by a confirmation of this judgment. The bank fund law permits all the banks to take lawful interest on all notes discounted, that have no more than sixty-three days to mature ; and confines them to six per cent. only on paper having that and a shorter time to run. Out of the city of New-York, where more than six per cent. can rarely be obtained by the banks, it is well understood the paper offered for discount is generally drawn payable in sixty-three days, which takes it out of the six per cent. restriction, and might, therefore, all be affected by such a decision.

Anticipating what the decision will be, I beg leave to enter my protest against a confirmation of the judgment in this case. I am for *reversing*.

On the question being put, *" Shall this judgment be reversed ?"* the members of the court voted as follows :

For *reversal*—The CHANCELLOR, and Senators HUBBARD, REXFORD, SANFORD, SHERMAN, THROOP, WARREN, and WESTCOTT—8.

For *affirmance*—The PRESIDENT of the Senate, and Senators ALLEN, ARMSTRONG, BEARDSLEY, BRONSON, CONKLIN, DEITZ, DODGE, FOSTER, GERE, LYNDE, MATHER, MAYNARD, M'LEAN, TALMADGE, and TODD—16.

Whereupon, the judgment of the supreme court was *affirmed*, with single costs.

[*Remainder of the Cases in Error in next volume.*]